RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0119p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

STEVE B. SMITH,

*Plaintiff,*

DAVID KUCERA; VICKIE F. FORGETY,

*Plaintiffs-Appellees,*

No. 13-5957

*v.*

JEFFERSON COUNTY BOARD OF SCHOOL COMMISSIONERS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:03-cv-00593—Thomas W. Phillips, District Judge.

Argued:  October 7, 2014

Decided and Filed:  June 11, 2015

Before:  BATCHELDER, GILMAN, and GIBBONS, Circuit Judges

_____

COUNSEL

**ARGUED:**  Jonathan Swann Taylor, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellant.  Eric J. Morrison, STONE & HINDS, P.C., Knoxville, Tennessee, for Appellees.  **ON BRIEF:**  Jonathan Swann Taylor, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellant.  Eric J. Morrison, M. Todd Ridley, George F. Legg, STONE & HINDS, P.C., Knoxville, Tennessee, for Appellees.  Jeremy D. Tedesco, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, David A. Cortman, Rory T. Gray, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, Jay Alan Sekulow, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., Thomas H. Castelli, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TENNESSEE, Nashville, Tennessee, for Amici Curiae.

1

GIBBONS, J., delivered the opinion of the court in which GILMAN, J., joined, and BATCHELDER, J., joined in part.  BATCHELDER, J. (pp. 21–33), delivered a separate opinion concurring in parts I–III and in the result.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   A county school board, facing a budget shortfall, abolished its alternative school and contracted for its students to be educated in the secular, alternative-school program at a private, Christian school.  David Kucera and Vickie Forgety, teachers who lost their jobs in the abolition of the original alternative school, sued the school board, asserting an Establishment Clause violation.  The district court held that the School Board's action violated the Establishment Clause and awarded damages and an injunction.  For the following reasons, we reverse.

I.

A.

At some time in the 2002–2003 school year, Doug Moody—Director of the Board of School Commissioners in Jefferson County, Tennessee—started anticipating budget problems. He learned that the Board would receive only ten cents of the property tax rate, less than a quarter of the funds the Board had requested.  Consequently, Moody and his colleagues began considering "big ticket" items that could be cut from the budget.  At that time, the Board operated its own alternative school.  Board employees staffed the alternative school, including plaintiffs Vickie Forgety and David Kucera, both teachers.  In July 2003, the Board voted to eliminate the alternative school for the upcoming school year and to contract with Kingswood School, Inc., to provide alternative-school services.  Tennessee law requires each local school board to provide alternative-school services for students in the seventh through twelfth grades. Tenn. Code Ann. § 49–6–3402.  Kingswood is a 501(c)(3) non-profit entity and is licensed by the Tennessee Department of Mental Health and Developmental Disabilities.  Moody calculated that the move would save the Board over $170,000 per school year.  According to the parties'

stipulation, the Board's "sole motivation" for this measure was "to reconcile the Board's budget with the Commission's fund allotment."

Moody wrote to inform Forgety and Kucera that their positions would no longer exist due to the school's closing. Moody told them that the Board would make "every effort" to place them in an area of their certification for the coming year. Forgety rejected the two teaching positions that she was offered and asked that she be placed on the "preferred re-employment list" for administrative or principal positions. She was unemployed for seven months before accepting the principal position at a Jefferson County school. Kucera was unemployed for two months and, having received no teaching offers, he instead returned to a former job at a youth center.

Beginning in the 2003–2004 school year and continuing until 2009, middle-school and high-school students in the Jefferson County public school system attended Kingswood if they had been suspended or expelled from their ordinary schools. For the 2009–2010 school year, high-school students from Jefferson County remained at Kingswood, while middle-school students returned to public schools. Kingswood was responsible for all facets of the County's alternative-school program: hiring, firing, evaluating, and supervising staff; managing the finances; running the day-to-day operations; communicating with parents; providing report cards; and determining the term of some students' suspensions from their regular schools. At various times during the life of Kingswood's contract with Jefferson County, Kingswood also worked with four other Tennessee counties in various capacities. This included an arrangement with Claiborne County to educate all of its alternative students for several years in the early 2000s.

Kingswood had two separate programs at the time: the day program and the residential program. The residential program—which served troubled, neglected, and abused children— maintained a religious character and included deliberate religious instruction. The Jefferson County students were exclusively within the day program, however, which did not feature deliberate religious instruction. The day program has been recognized by the Tennessee Senate as one of the model alternative-school programs for the state's school systems.

Day students attended classes taught by state-licensed teachers, who were employees of Kingswood. The students also regularly met with licensed professional counselors. When the public-school students first arrived at Kingswood, Reverend Steve Walker—Kingswood's campus minister—performed their intake sessions. Religion did not form any part of those sessions. Day students attended assemblies in Kingswood's on-campus chapel on some occasions, although attendance was strictly voluntary. Unsurprisingly, the chapel contained religious imagery. There is no evidence, however, that the assemblies included religious content. All classes took place in the separate school building, which did not include any religious symbols or messages. There is no suggestion that day students were required to pray, observe a "moment of silence," or engage in any other religious or spiritual activity.

Nonetheless, day students and their parents were not entirely insulated from all signs of Kingswood's religious environment. Students were required to submit a weekly family-feedback form—signed by their parents—in order to advance within the day program. That form contained the following quote from the Gospel of Luke: "Jesus . . . said, Suffer little children to come unto me, and forbid them not: for of such is the kingdom of God." Parents were also required to sign report cards, which contained the same Biblical text. Kingswood's director testified that the scripture—from the Gospel of Luke—could be interpreted as an invitation into the kingdom of God. The same passage appeared, accompanied by crosses, on the school's Easter 2006 letter. The letter claimed: "Kingswood School is unique because we offer children a Christian environment of love and encouragement. . . . Kingswood remains one of the few places where children in need can get help in a Christian environment. We are a non-profit faith based ministry . . . ."

Those who sought out the 2005 Annual Report saw that it contains a picture of the chapel and says that each child will receive Christian religious training, and that emphasis is placed upon "instilling in each child a personal faith in God, and the assurance of the saving grace of Jesus Christ." The "school improvement plan," completed before the Jefferson County contract and still in effect afterward, stated the belief that schools must provide for "spiritual growth" in order to serve the "'whole' student."

The Kingswood website also contained some religious references.[1] It claimed, for example, that "Kingswood has survived independently by remaining true in faith to the principles of a Christian education without being bound to the doctrine of a particular denomination or sect's control." It states that the school will take care of a child's "spiritual and religious life," although it will not compel a student to adopt any particular religious doctrine. The website refers to Kingswood as a "Christian charity," and explains its "Methodist-rooted beginnings." It says that the school "has observed a Christian approach that has remained inter-faithed and unaffiliated with a particular Christian denomination."

But none of these communications appear to have been targeted specifically at the Jefferson County students. Communications of this nature appeared to be part of the fabric of the Kingswood community and, for the most part, were in use before the Jefferson County students arrived. Notably, in addition, there is no indication that any Jefferson County student or parent complained to Kingswood or the School Board about any of Kingswood's religious references.

Over the course of the seven-year arrangement, the School Board paid Kingswood a total sum of $1,702,368. The money was deposited in Kingswood's general operating account, leaving Kingswood with discretion over the expenditure of the money. The money from the School Board enabled Kingswood to hire additional teachers. On the other hand, Kingswood's financial records show that it operated at a loss every year that the Board contracted for alternative-school services.

The Jefferson County alternative students of middle-school age stopped attending Kingswood at the end of the 2008–2009 school year and returned to Jefferson County public schools. The high-school-aged students remained at Kingswood for one more year, before the arrangement ended altogether in 2009–2010. Since then, Jefferson County has used federal funds and grant money to establish a new, "model" alternative school. Kingswood no longer offers alternative-school services of any kind.

---

[1]The record demonstrates that the website contained these religious references in February 2010, by which time the Jefferson County middle-school students had left Kingswood and the high-school students were just months away from leaving. There is no evidence that the website existed—or contained the language cited here—at any earlier time.

B.

Plaintiffs brought an action in the Eastern District of Tennessee against the School Board and various individual Board members. The claim, based on 42 U.S.C. § 1983, alleged violations of the plaintiffs' procedural and due process rights under the Fourteenth Amendment, their rights under the Establishment Clause of the First Amendment, and similar rights under the Tennessee Constitution. The lawsuit also alleged various state statutory violations. Plaintiffs sought declaratory and injunctive relief, plus monetary damages for their lost wages.

The district court dismissed the action on summary judgment in 2006, holding that the teachers lacked standing. No. 30:03-CV-593, 2006 WL 3196919 (E.D. Tenn. Nov. 2, 2006). After a Sixth Circuit panel initially ruled on the case, 549 F.3d 641 (6th Cir. 2008), the court granted rehearing *en banc*. The *en banc* court held that the teachers had standing, in their capacity as municipal taxpayers only, to raise the Establishment Clause claim. *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206–16 (6th Cir. 2011) (*en banc*).[2] The court affirmed the grant of summary judgment against the teachers on their procedural and substantive due-process claims. *Id.* at 216–17. It also held that the individual Board members were entitled to legislative immunity. *Id.* at 217–19. But this court remanded the case to the district court to consider the claims under the Establishment Clauses of both the United States Constitution and the state constitution. *Id.* at 219. The district court denied the Board's motion for summary judgment. It also denied the Board's motion to preclude plaintiffs from presenting evidence in support of their state-law damages claims.

A bench trial took place in May 2013. In July 2013, the district court issued its findings of fact and conclusions of law, holding that the Board had violated the Establishment Clause. The court permanently enjoined the Board "from contracting with Kingswood or another religious entity for the operation of its alternative school." It also awarded plaintiffs damages for lost wages during the 2003–2004 school year. The Board timely appealed.

---

[2]The case initially featured a third plaintiff, Steve Smith. In the previous appeal, the *en banc* court held that the plaintiffs did not have standing as individuals, *Smith*, 641 F.3d at 206–09, but only as municipal taxpayers, *id.* at 209–19. By that time, Smith had moved to Georgia and no longer paid taxes in Jefferson County. *Id.* at 209. He therefore lacked standing because "[t]here is no danger of Smith's tax dollars being spent in violation of the Constitution." *Id.*

II.

Following a bench trial, we review the district court's factual findings for clear error. *Tackett v. M & G Polymers USA, LLC*, 733 F.3d 589, 595–96 (6th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 926 (2015). "Factual findings are clearly erroneous if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 556 (6th Cir. 2013) (internal quotation marks and alteration omitted). We review *de novo* the district court's legal determinations. *Tackett*, 733 F.3d at 596.

III.

We begin by addressing the Board's challenges to two of the district court's factual findings. First, the Board argues that the district court erred in finding that the Kingswood's day and residential programs were not meaningfully distinct. Second, the Board alleges error in the district court's characterization of Kingswood as a self-proclaimed religious institution.

In its first argument, the Board misreads the district court's opinion. The district court stated its acknowledgment "that the facts do not establish that Kingswood is *solely* a religious entity, nor do the facts establish that Kingswood's residential and day programs are not meaningfully distinct." *Kucera v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 956 F. Supp. 2d 842, 850 (E.D. Tenn. 2013). The sentence is somewhat confusing given its use of a double negative, but there can be no doubt about its meaning: the two programs are meaningfully distinct, or at least the evidence does not suggest otherwise. In other words, the district court found in the Board's favor on this particular fact, but still held that the program was "nevertheless violated." *Id.* There is no true objection here.

The Board's second argument fails on the merits. The district court described Kingswood as "a self-proclaimed 'religious institution.'" *Id.* at 849. This finding is not clearly erroneous. The Board points to evidence showing that Kingswood had secular elements and, at least in the day program, did not involve religious activities. But "[w]e cannot deem 'the factfinder's choice' between two permissible views of the evidence clearly erroneous." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 556 (6th Cir. 2010) (quoting *Harlamert v. World Finer*

*Foods, Inc.*, 489 F.3d 767, 771 (6th Cir. 2007)).   From the evidence in this case, it would certainly be permissible to conclude that Kingswood described itself as a religious institution. As one example, the school's Easter 2006 letter explained that "Kingswood School is unique because we offer children a Christian environment of love and encouragement."   The district court properly found that "the facts do not establish that Kingswood is *solely* a religious entity." *Kucera*, 956 F. Supp. 2d at 850.   At the same time, it was permissible to find that the school was a self-proclaimed religious institution.   Thus, the finding is not clearly erroneous.

IV.

A.

To decide whether a governmental action violates the Establishment Clause, we must weave together three main jurisprudential threads.   The first thread is the "*Lemon* test," named after the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).   Under that test, the action comports with the Establishment Clause only if it satisfies three distinct prongs.   First, the activity must "have a secular legislative purpose." *Id.* at 612.   Second, "its principal or primary effect must be one that neither advances nor inhibits religion." *Id.*   Third, it "must not foster 'an excessive government entanglement with religion.'" *Id.* at 613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)).

The next thread is an "endorsement" analysis, first discussed by Justice O'Connor in *Lynch v. Donnelly*, 465 U.S. 668 (1984).   As Justice O'Connor intended, *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring), the Sixth Circuit "has treated the endorsement test as a refinement or clarification of the *Lemon* test." *Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999); *see also, e.g.*, *Satawa v. McComb Cnty. Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (explaining the Sixth Circuit's application of the *Lemon* test); *Am. Civil Liberties Union v. Grayson Cnty.*, 591 F.3d 837, 844–45 (6th Cir. 2010) (using the *Lynch* discussion as guidance in applying the *Lemon* test).   Justice O'Connor explained that *Lemon*'s first prong, which focuses on the government's purpose, really asks "whether [the] government's actual purpose is to endorse or disapprove of religion." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).   While the first *Lemon* prong is subjective, the second is objective.   It asks "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of

endorsement or disapproval." *Id.* If either the purpose or effect of the government activity is to endorse or disapprove of religion, the activity is unconstitutional. *Id.*

Excessive entanglement—*Lemon*'s third prong—remains relevant. Under Justice O'Connor's test, such entanglement would still be grounds for striking down the activity, even if there is no hint of endorsement or disapproval. *See id.* at 689. Since then, however, the Court has "recast *Lemon*'s entanglement inquiry [in the public school context] as simply one criterion relevant to determining a statute's effect." *Mitchell v. Helms*, 530 U.S. 793, 808 (2000) (plurality opinion) (citing *Agostini v. Felton*, 521 U.S. 203, 232–33 (1997)).

The final jurisprudential thread—most recently seen in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), but relevant since *Marsh v. Chambers*, 463 U.S. 783 (1983)—involves a historical approach. It takes the view that "it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819.

We must be mindful of both the context of the government action and the specific circumstances surrounding it. *See Van Orden v. Perry*, 545 U.S. 677, 700 (2005) (Breyer, J., concurring in the judgment) (emphasizing that the Establishment Clause inquiry "must take account of context and consequences"); *Lee v. Weisman*, 505 U.S. 577, 597 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one.").

In the present case, the parties stipulate that the School Board's "sole motivation" for contracting out its alternative-school services to Kingswood was "to reconcile the Board's budget with the Commission's fund allotment." There is no question, then, that the Board had a secular purpose, as *Lemon*'s first prong and Justice O'Connor's subjective test require. *See Lemon*, 403 U.S. at 612; *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

Our inquiry, then, should be threefold. First, does historical practice indicate that the Board's action was constitutionally compliant, regardless of any specific test? Second, did the relationship with Kingswood have the effect of advancing religion—or, in other words, did it

objectively convey a message of religious endorsement?   Third, did it foster an excessive entanglement of government and religion?

### B.

In our view, *Town of Greece* does not impact our approach to the case before us.   In *Town of Greece*, the Supreme Court held that the town's practice of opening its monthly board meetings with a prayer was consistent with the Establishment Clause.   134 S. Ct. at 1816. Relying heavily on *Marsh v. Chambers*, 463 U.S. 783 (1983)—a prior case upholding legislative prayer in a state legislature—the *Town of Greece* Court explained that "the Establishment Clause must be interpreted by reference to historical practices and understandings."   *Town of Greece*, 134 S. Ct. at 1819 (internal quotation marks omitted).   The Justices therefore interpreted the Establishment Clause by reference to the fact that legislative prayer was an accepted practice at the time the First Amendment was being debated and ratified.   *See id.* at 1818–19.   "That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society."   *Id.* at 1819.   At the state and local levels, too, legislative prayer has long been accepted.   *Id.*   Given the long-established practice, the Court deemed it unnecessary to apply any specific test to determine compliance with the Establishment Clause.   Instead, it interpreted the contours of the Clause as embracing the historical practice. *See id.*   The town's practice of legislative prayer—even sectarian prayer—was constitutional because it did not "fall outside the tradition [the] Court has recognized."   *Id.* at 1824.

But in the instant case, the pure historical approach is of limited utility.   "The simple truth is that free public education was virtually nonexistent in the late 18th century . . . [so] it is unlikely that the persons who drafted the First Amendment, or the state legislators who ratified it, anticipated the problems of interaction of church and state in the public schools."   *Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J., concurring in the judgment) (internal citation omitted); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 238–39 (1963) (Brennan, J., concurring) (explaining that, because schools in the late Eighteenth Century were predominantly private and sectarian, "[i]t would . . . hardly be significant if the fact was that the nearly universal devotional exercises in the schools of the young Republic did not provoke criticism"); *see also*

*Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (finding the historical approach of *Marsh* unhelpful in the public-school context).  Historical practices, therefore, do little to answer the question before us.

In cases like this one that cannot be resolved by resorting to historical practices, we do not believe that *Town of Greece* requires us to depart from our pre-existing jurisprudence.  In many ways, the Supreme Court's recent decision was simply an application of its decision three decades earlier in *Marsh*.  Justice Kennedy described his own majority opinion in *Town of Greece* as "consistent with the Court's opinion in *Marsh v. Chambers*."  134 S. Ct. at 1815. *Marsh* upheld the practice of opening sessions of the Nebraska legislature with a prayer. 463 U.S. at 795.  The Court reached this decision because, "[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society."  *Id.* at 792.  The Court did not apply *Lemon* or any other test; history alone was conclusive.  And yet, the Court applied *Lemon*—and Justice O'Connor's clarification of *Lemon*—in many opinions after *Marsh*, never holding that the historical approach had become the only relevant, or even dominant, mode of analysis.  *See, e.g.*, *McCreary Cnty. v. Am. Civil Liberties Union*, 545 U.S. 844, 859 (2005); *Agostini v. Felton*, 521 U.S. 203, 232 (1997); *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988); *Lynch*, 465 U.S. at 672.  Likewise, *Town of Greece* gives no indication that the Court intended to completely displace the endorsement test.  The opinion does not address the general validity of the endorsement test at all; it simply explains why a historical view was more appropriate in the case at hand.  We therefore apply the endorsement analysis here.

## C.

We must next consider whether the relationship between the School Board and Kingswood had the primary effect of advancing religion, *see Lemon*, 403 U.S. at 612, or—as clarified by Justice O'Connor—whether the action conveyed an objective message that the government was endorsing religion, *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

The Supreme Court has made clear that the state endorses religion when it coerces participation in a religious activity.  Coercion not only includes securing participation through rules and threats of punishments but also includes imposing public pressure, or peer pressure, on

individuals. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (holding that a school's policy of permitting student-initiated, non-sectarian prayer before public high-school football games violated the Establishment Clause); *Lee*, 505 U.S. at 599 (ruling that the inclusion of prayers in public schools' graduation ceremonies violates the Establishment Clause).

Here, there is no suggestion that the Board's association with Kingswood coerced students to partake in religious activity of any kind, either directly or through peer pressure. Although the students met with a pastor for intake meetings, there is no indication that the meetings touched on religion in any way. And although the students used the chapel for assemblies, the record does not indicate that the assemblies required participation in any religious or spiritual practice. Classroom activities did not include religious instruction, prayers, or moments of reflective silence. In light of these facts, we find the district court's conclusion that the atmosphere was coercive to be clearly erroneous.

But the absence of coercion does not end the inquiry. Even if the government does not compel citizens to actually *participate* in religious observances, the government may endorse religion, and thus offend the Constitution, in other ways. *See, e.g., Stone v. Graham*, 449 U.S. 39, 42–43 (1980) (per curiam) (striking down a Kentucky law that required the posting of the Ten Commandments in public classrooms).

The government violates the endorsement test if a reasonable observer would think that the activity is a governmental endorsement of religion. *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment); *Granzeier*, 173 F.3d at 573. "[T]he reasonable observer . . . must be deemed aware of the history and context of the community," as well as the context in which the challenged government activity took place. *Pinette*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment). Although the Supreme Court has "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *Grayson Cnty.*, 591 F.3d at 846 n.5 (quoting *Van Orden*, 545 U.S. at 690–91 (plurality opinion)) (internal quotation marks omitted), this does not mean that we abandon our duty to apply the reasonable observer test in a rigorous, fact-specific manner. *See, e.g., Rusk v. Crestview Local Sch. Dist.*, 379 F.3d 418, 424 (6th Cir. 2004). We must look closely at the particular

circumstances of the case and consider how a reasonable observer—aware of the relevant background—would view the specific circumstances of the case. *See id.* (concluding that a reasonable observer would not view the distribution of leaflets including both religious and non-religious activities in an elementary school as an endorsement of religion).

Here, a reasonable observer would not interpret the School Board's relationship with Kingswood as a governmental endorsement of religion. Parents and students, for example, encountered only *de minimis* religious references in Kingswood's day program. The evidence indicates that students in the day program were not exposed to any religious instruction, prayer, or any mentions of religion at all. Their school building was devoid of any religious imagery. Their assemblies in the chapel were as close as the day students came to religious exposure, and yet those assemblies were completely secular activities.

Perhaps the most overt religious references were the Biblical quotes on the report cards, family-feedback forms and—for those who sought them out—the annual report and school-improvement plan.[3] But a reasonable observer would view all of these in the specific context of the arrangement that Kingswood had with Jefferson County. A budgetary crisis forced the Board to close its alternative school and, needing to accommodate the alternative-school students on short notice, the Board selected a high-performing, state-certified alternative school. This allowed the Board to fulfill its legal obligation to provide an alternative school. The move saved significant taxpayer money and ensured that the alternative students received a sound education over the course of the seven-year arrangement. By the end of that arrangement, Jefferson County had established its own model alternative school.

Viewed in this context, it is clear that the taxpayers, School Board, parents, and students all benefited from the relationship between the Board and Kingswood. While this benefit was being conferred, parents and children received only slight exposure to religious content.[4] The

---

[3]Though the website may also have contributed to the overall impression, the record does not show any religious content on the website prior to the spring of 2010, when Jefferson County's middle-school students had left Kingswood and the high-school students were mere months away from following suit.

[4]Even if we viewed the parents' and children's exposure to religious content as more than slight, it would be peculiar for us to rely on that exposure to find an Establishment Clause violation in this case, in which no student or parent complained about Kingswood's religiosity. In doing so, we would be allowing aggrieved former employees (who have not been exposed to any religious references) to step into the shoes of those who have been exposed: the students and parents in this case, who did not wish to complain. This peculiarity stems, of course, from

exposure they did receive stemmed from Kingswood's pre-existing status as an unapologetically Christian institution. The mere status of Kingswood as a religious organization does not itself give rise to endorsement. "The First Amendment does not demand a wall of separation between church and state." *Am. Civil Liberties Union v. Mercer Cnty.*, 432 F.3d 624, 638 (6th Cir. 2005). Furthermore, the religious communications were not targeted specifically at the day students, much less the Jefferson County students in particular, but were disseminated in accordance with the way that Kingswood had always operated as an institution. Imbued with this background knowledge—none of which was a secret—a reasonable observer would not have viewed the arrangement as a governmental endorsement of religion. Such an observer would have instead interpreted the arrangement of the School Board as doing the best it could, in the face of unexpected budgetary constraints, to fulfill its legal obligation to provide an alternative-school system and to give the alternative students the best available education.

This case is unlike *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679 (6th Cir. 1994), on which Kucera and Forgety rely. In *Washegesic*, this court held that it was unconstitutional for a public school to display a portrait of Jesus in a hallway. That was consistent with *Stone v. Graham*, 449 U.S. 39 (1980), in which the Supreme Court held that a classroom display of the Ten Commandments, which were not integrated into any course of study, violated the Establishment Clause. The *Washegesic* court explained that the portrait had "a proselytizing, affirming effect," and would appear to some as "a governmental statement

---

the peculiar doctrine of municipal-taxpayer standing. The last time this case was before us, we correctly held—in accordance with Supreme Court precedent—that Kucera and Forgety could proceed on that basis. *Smith*, 641 F.3d at 215–16.

But we share the several concerns that Judge Sutton raised on that occasion. Municipal taxpayers are able to rely on what would otherwise be labeled a generalized grievance. *Id.* at 222 (Sutton, J., concurring) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574, 576–77 (1992)). The doctrine also allows the litigant to sidestep the "zone of interest" test that courts apply in other instances. *Id.* (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982)). As Judge Sutton explained:

> The municipal-taxpayer-standing doctrine pays heed only to the taxes paid, not to the nature of the constitutional claim. Here, as a result, the doctrine has permitted teachers who never witnessed anything remotely creating an Establishment Clause violation . . . to challenge the law, even though the claimants seemingly could not satisfy the prudential standing limitations.

*Id.* at 222. As Judge Sutton further explained, this peculiarity is compounded where—as in this case—the activities do not deplete the government coffers but in fact save the government money. *See id.* at 223. Kucera and Forgety thus complain of the remote and ethereal notion that their tax money is being used for unconstitutional ends. But of course, though "there is much to be said for reconsidering the municipal-taxpayer-standing doctrine, or . . . at least for recalibrating it," it is for the Supreme Court to do so. *See id.* at 222–23; *see also Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 284–87 (raising similar concerns about municipal-taxpayer standing but holding, based on Supreme Court precedent, that municipal-taxpayer standing existed in the case).

favoring one religious group and downplaying others." *Washegesic*, 33 F.3d at 684. It is easy to see why a reasonable observer could view the portrait as endorsing religion. It was prominently displayed in the school building, outside the principal's office and the gymnasium, *id.* at 681, and was placed there by the public school itself. Its presence served no apparent educational purpose. By contrast, in the present case, a non-governmental entity—Kingswood—was responsible for the few religious references that were conveyed to observers. Those references occurred because Kingswood already operated, in some aspects, as a Christian school. But the purpose of the arrangement with Kingswood was purely educational, and the religious references merely incidental. A reasonable observer would rightly view the religious references in this case very differently from the portrait in *Washegesic*.

The appellees and the district court also rely heavily on a recent decision from the Seventh Circuit, *Doe ex rel. Doe v. Elmbrook School District*, 687 F.3d 840 (7th Cir. 2012) (*en banc*). Although we are not bound by that case, our decision today and the Seventh Circuit's opinion in *Elmbrook* can comfortably co-exist. *Elmbrook* involved a school district that held its high-school graduation ceremonies in the main sanctuary of a local church. *Id.* at 842. The church had an "emphatically Christian" atmosphere, *id.* at 845, and it had "conditions of extensive proselytization," *id.* at 843. Religious imagery was all around the inside and outside of the church. Tables and stations in the lobby carried "evangelical literature, much of which addresses children and teens." *Id.* at 846. During one ceremony, church members passed out this literature to those attending the graduation. *Id.* The majority decided that an observer "could reasonably conclude that the [School] District would only choose such a proselytizing environment aimed at spreading religious faith—despite the presence of children, the importance of the graduation ceremony and, most importantly, the existence of other suitable graduation sites—if the District approved of the Church's message." *Id.* at 854. The majority also held that the use of the church was coercive, even though there was no actual religious activity, because attending the ceremony in the religious environment was not truly voluntary. *See id.* at 854–55 (citing *Lee*, 505 U.S. at 585–86; *Santa Fe*, 530 U.S. at 301). Under the circumstances, the court held that "the practice . . . had the unfortunate side effect of fostering the very divisiveness that the Establishment Clause was designed to prevent." *Id.* at 856.

There are significant differences between *Elmbrook* and the case before us that lead to the difference in the outcome. *See id.* at 843–44 (emphasizing the limitations of the court's holding and the need for a fact-specific inquiry). First, although the day students at Kingswood attended assemblies in a chapel containing some religious imagery, the evidence does not suggest that the chapel had the kind of proselytizing atmosphere that the *Elmbrook* court described. There is no evidence, for example, of religious literature being distributed. In addition, as we have already noted, nothing about Kingswood was coercive. As in *Elmbrook*, there were no religious activities involved. And although it may have been inconvenient for a child to withdraw from the assemblies, attendance was not required and the assemblies did not carry anything like the monumental life importance that makes attendance at a high-school graduation close to mandatory. The *Elmbrook* court repeatedly emphasized that the school district had other venue choices besides the church, *see, e.g.*, *id.* at 848, 853, and acknowledged that the analysis would have been different if it had been the only venue available, *id.* at 844. The record in the case at bar does not tell us whether the arrangement with Kingswood was the School Board's *only* choice. But it is clear that the Board's options were tightly constrained by the budget crisis, the legal obligation to provide an education for alternative-school students, the desire to make that education effective, and time pressures.

The specific circumstances of the case at bar convince us that the School Board's relationship with Kingswood did not amount to a governmental endorsement of religion.

D.

Nor does this case involve excessive entanglement between church and state. The relationship between the Board and Kingswood does not resemble the kinds of relationships that give rise to entanglement problems. In determining whether there is excessive entanglement, we consider "'the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Steele v. Indus. Dev. Bd. of Metro. Gov't Nashville*, 301 F.3d 401, 425 (6th Cir. 2002) (quoting *Agostini*, 521 U.S. at 232).

An important difference between this case and many other Establishment Clause cases is that, although money changed hands between the government and a religious institution, the

School Board paid money under a contract for a specific, essential service. In other words, this case does not involve government aid. Where government aid is involved, courts scrutinize whether it was given in a neutral manner between religious and non-religious institutions. So, for example, it is constitutionally permissible for a government to issue vocational grants that allow instruction in religious vocations, *Witters v. Wash. State Dep't of Servs. for the Blind*, 474 U.S. 481 (1986); or to allow funding for a sign-language interpreter in a Catholic school, *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993); or to send public-school teachers into parochial schools to give remedial instruction, *Agostini*, 521 U.S. 203; or to include religious schools within an equipment-lending scheme, *Mitchell*, 530 U.S. 793. It is even constitutionally permissible to grant aid that may be used for religious indoctrination, provided that aid "is offered to a broad range of groups of persons without regard to their religion." *See Mitchell*, 530 U.S. at 809.

Here, the government was not providing aid. The fact that Kingswood received money under the contract arguably conferred a benefit on it that it could have used for religious purposes. But this potential benefit, without more, is never sufficient to establish an Establishment Clause violation. *See Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 515 (6th Cir. 2001) (citing *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 747 (1976)). This is especially so in the present case because Kingswood operated the day program at a loss, leaving no excess government money that could be used for religious purposes.

Even if we were required to examine the Board's payments for neutrality, it would be significant that the contract with Kingswood benefited all alternative students—no matter their religious background—in addition to serving the needs of the School Board and the taxpayer. Nothing about the contractual arrangement with Kingswood indicates any religious preference on the part of the Board.

In prior cases, entanglement has arisen when the nature of the relationship requires "comprehensive, discriminating, and continuing state surveillance" to ensure that state funds were not being used for improper purposes. *Lemon*, 403 U.S. at 625. On this basis, the Court struck down Pennsylvania's policy of reimbursing non-public schools for teaching and supplies for secular subjects, *id.* at 625, and Rhode Island's supplementing of private-school teacher

salaries, *id.* No such monitoring was required or took place in the case at bar. Kingswood's performance of the contracted service, the education of the alternative-school students, did not require significant monitoring because it took place in the context of an established and structured day program—a program that, as discussed, was consistently run in a secular manner.

Alternatively, relationships between the government and a religious institution may result in excessive entanglement when essential governmental functions are delegated to religious entities. For example, the Supreme Court struck down a law giving religious entities veto power over applications for liquor licenses. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126–27 (1982). A similar problem arose in the school setting in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994). There, the Court struck down a law giving a religiously defined community control over a local school board. *Id.* at 702. Nothing approaching this level of delegation occurred in Jefferson County. The School Board contracted out one essential, specialist aspect of its functions to a successful, state-licensed institution. Unlike *Larkin* and *Kiryas Joel*, where there was the potential (and even arguably the purpose) of allowing governmental decisions to be made for religious reasons, there was no such risk in the present case because Kingswood carried out its service in a secular manner.

Nothing about this case suggests that excessive entanglement resulted from the relationship between the Board and Kingswood. The Board entered into a contract to obtain an essential service from Kingswood, but neither the state nor the religious entity became entangled in the affairs of the other.

E.

In sum, this case involves a secular legislative purpose, does not give rise to a governmental endorsement of religion, and does not entail an excessive entanglement between the government and religion. There is no violation of the Establishment Clause, and we therefore reverse the judgment of the district court.

V.

In the absence of an Establishment Clause violation, Kucera and Forgety are not entitled to any remedies. We therefore vacate the injunction against the School Board and also vacate the damages award.

While damages are clearly unavailable under 42 U.S.C. § 1983, they are also unavailable under state law. The plaintiffs sought damages under Tenn. Code Ann. §§ 49–2–203, 49–5–501 et seq., and 49–6–3402, and the district court cited § 49–5–511 in calculating damages. However, no state statutory cause of action was properly before the court.

In November 2006, the district court granted the School Board's motion for summary judgment. In the same order, the court dismissed, without prejudice, plaintiffs' claims under Tennessee statute. The dismissal of the statutory claims was under 28 U.S.C. § 1367(c)(1) and (3). Plaintiffs did not appeal the dismissal of these claims. Because they were dismissed without prejudice, this left plaintiffs the option to re-file the claims. If the district court had dismissed the state claims only under 28 U.S.C. § 1367(c)(3), plaintiffs could have re-filed those claims after this court reversed the district court's grant of summary judgment on the federal claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to raise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Smith*, 641 F.3d at 216 (reinstating the Establishment Clause claim, and therefore providing a basis on which the district court could have exercised supplemental jurisdiction over the state statutory claims). However, to do so would have been futile because the district court also dismissed the state claims under § 1367(c)(1). This provision allows dismissal of a supplemental claim on the basis that "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1).

This court's reversal of summary judgment on the federal claims would not have cured the novelty or complexity of the claims under Tennessee statute. As a result, the state statutory claims were no longer a part of the case after the district court dismissed them. They were not properly before the district court when it entered judgment for plaintiffs and could not provide a basis for an award of compensatory damages. Because plaintiffs were not entitled to any damages, we reverse the district court's entire damages award.

Finally, Kucera and Forgety are not entitled to recover their attorney's fees.  The district court ordered that they could recover their attorney's fees in an amount to be determined later.  But that decision turned on Kucera's and Forgety's status as the "prevailing part[ies]" in the suit.  42 U.S.C. § 1988(b); *see also DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 670 (2006) ("'The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties.'" (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)).  Based on our decision, plaintiffs have not prevailed in any aspect of the suit and thus are not entitled to collect attorney's fees.

## VI.

For the above reasons, we reverse the district court's decision on the Establishment Clause issue, vacate the judgment, vacate the injunction against the School Board, vacate the award of damages, and vacate the order granting attorney's fees.

---

**CONCURRING IN PART**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and concurring in the result. I agree that the Jefferson County Board of School Commissioners' decision to contract with Kingswood does not violate the Establishment Clause and join parts I, II, and III of the court's opinion, but I write separately because my reasoning differs from that of the lead opinion in part IV.

I.

As a threshold matter, while I concede that we are bound by our en banc decision holding that these Plaintiffs have standing as municipal taxpayers to bring this Establishment Clause claim—and hence, we must decide the merits of this case—I continue to believe that decision is not correct. *See Smith v. Jefferson Cnty Bd. of Sch. Comm'rs*, 641 F.3d 197, 223–26 (6th Cir. 2011) (en banc) (Batchelder, C.J., concurring in part and dissenting in part). This is an employment-contract dispute masquerading as an Establishment Clause case. The proof of the true nature of this case is partly found in the fact that the Plaintiffs seek monetary damages. Judicial relief in an Establishment Clause case is equitable in nature, taking the form of an injunction that undoes the government's establishment of religion. *See, e.g., Engel v. Vitale*, 370 U.S. 421, 425 (1962) (prohibiting public-school officials from leading students in classroom prayer). We do not grant monetary damages for violations of the Establishment Clause.

II.

The endorsement test applies here, but only because we are constrained to follow it at the present time. The Supreme Court recently handed down a watershed decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). I disagree with the lead opinion's characterization of *Town of Greece* as applying only to a subset of Establishment Clause claims such as legislative-prayer cases. But I also disagree with the opinion's description of the status quo ante of Establishment Clause jurisprudence prior to *Town of Greece*, and would engage in a somewhat different analysis in reaching the conclusion that the local government's action here is constitutional.

A.

The Establishment Clause of the First Amendment commands that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The Supreme Court has extended this prohibition to the States and their political subdivisions through the Fourteenth Amendment Due Process Clause. *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). For more than four decades, courts have struggled with how to decide Establishment Clause cases, as the governing framework has profoundly changed several times. As Justice Scalia—perhaps tongue-in-cheek, but absolutely accurately—observed in his concurrence in *Van Orden v. Perry*, 545 U.S. 677 (2005), "I join the [principal opinion] because I think it accurately reflects our current Establishment Clause jurisprudence—or at least the Establishment Clause jurisprudence we currently apply some of the time." *Id.* at 692 (Scalia, J., concurring). This confusion has led our court to opine that the judiciary is confined to "Establishment Clause purgatory." *ACLU v. Mercer Cnty.*, 432 F.3d 624, 636 (6th Cir. 2005).

We held three years ago that "[u]nder today's *Lemon* [*v. Kurtzman*, 403 U.S. 602 (1971)] test, we ask: (1) whether the government's predominant purpose was secular; (2) whether the government action has the purpose or effect of endorsing religion, and (3) whether the action fosters an excessive entanglement with religion." *Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (citation, footnote, and internal quotation marks omitted). But as an inferior court, we must apply that articulation only in a manner that is fully consistent with each of the Supreme Court's many decisions in this difficult area of law.

In *Lemon*, the Supreme Court held that a state action touching upon religion violates the Establishment Clause unless it (1) has a primarily secular purpose, (2) has an effect that neither advances nor inhibits religion, and (3) does not excessively entangle government with religion. *Lemon*, 403 U.S. at 612–13. Although the Court soon thereafter described the *Lemon* test's three prongs as merely factors that "are no more than helpful signposts," *Hunt v. McNair*, 413 U.S. 734, 741 (1973), it has never renounced them.

The Court's application of *Lemon* has varied. For example, in *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the Court invalidated a Kentucky statute requiring the posting of the Ten Commandments in public-school classrooms because the statute lacked a secular purpose and

therefore "violates the first part of the [*Lemon*] test." *Id.* at 43. The Court did not consider whether the statute also had the effect of advancing (or endorsing) religion, or entangled government with religion. *See id.* at 41–43. But in *Bowen v. Kendrick*, 487 U.S. 589 (1988), after examining all three *Lemon* prongs, the Court upheld grants to private organizations, including religious organizations, for premarital-sex and pregnancy counseling under the Adolescent Family Life Act. *See id.* at 602–18.

Occasionally the Court decides cases on grounds other than *Lemon*. For example, in *Marsh v. Chambers*, 463 U.S. 783 (1983), the Court eschewed *Lemon*, instead examining history to conclude that conducting prayers at the outset of policymaking-body sessions is constitutional. *See id.* at 786–92. *Marsh* declared the test to be that a legislative-prayer practice is constitutional so long as it does not "proselytize or advance any one, or [] disparage any other, faith or belief." *Id.* at 794–95.[1] The following year, the Court applied *Lemon* to uphold a publicly owned crèche (i.e., a Christian nativity scene) on private land, but looked to history to inform its judgment that the Christmas display had a secular purpose, did not advance religion, and did not entangle government with religion. *See Lynch v. Donnelly*, 465 U.S. 668, 678–85 (1984).

1.

Five years later, a narrow majority of the Supreme Court revised *Lemon*'s second prong, the "effects prong," to hold that the test is "whether the challenged governmental practice has the purpose or effect of 'endorsing' religion." *Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989). This test requires a court to determine whether a "reasonable observer" would conclude that the state action is an endorsement of religion. *Id.* at 620 (plurality opinion of Blackmun, J.). The five-Justice majority based this revision on Justice O'Connor's separate opinion in *Lynch*, positing that the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* at 594 (majority opinion) (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)). Four Justices dissented from adopting the endorsement test, arguing that the Court should instead look

---

[1]*Town of Greece* restated *Marsh*'s test, holding that a given practice might be coercive—and thus unconstitutional—if the prayers, as a pattern "over time," "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." *Town of Greece*, 134 S. Ct. at 1823.

to history and to whether anyone is being coerced by the state action to participate in religion. *See id.* at 657–70 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Since adopting the endorsement test in 1989, the Court has continued to modify the Establishment Clause's governing framework, sometimes by revising the endorsement test. In 1997, the Court relegated *Lemon*'s third prong (entanglement) to being merely a factor in determining whether the government has violated *Lemon*'s second prong (effects), which in turn is violated when government endorses religion. *See Agostini v. Felton*, 521 U.S. 203, 232–33 (1997).[2] Then in 2005, the Court held that the first prong of *Lemon* (purpose) is violated when a reasonable observer would conclude government is endorsing religion. *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) ("By showing a purpose to favor religion, the government sends the . . . message to . . . nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . ." (internal quotation marks omitted)); *id.* at 883 (O'Connor, J., concurring) ("The purpose behind the counties' display is relevant because it conveys an unmistakable message of endorsement to the reasonable observer.").[3] After *McCreary*, it is unclear whether *Lemon* can still be distinguished from the endorsement test.

The Court occasionally sets the endorsement test aside to decide Establishment Clause claims under a different test, or applies multiple tests. The Court invalidated benedictional prayers at public-school graduations not because they endorse religion, but because, the majority held, such prayers coerce school-age children to participate in a religious exercise, since they have no meaningful choice but to attend their graduation. *Lee v. Weisman*, 505 U.S. 577, 592, 594, 599 (1992). The Court later invalidated prayers before high-school football games, both

---

[2]A majority of the Court subsequently discussed how *Agostini* collapsed *Lemon* into a two-pronged inquiry. *Mitchell v. Helms*, 530 U.S. 793, 807–08 (2000) (plurality opinion) (affirming that in *Agostini* "we therefore recast *Lemon*'s entanglement inquiry as simply one criterion relevant to determining a statute's effect"); *see also id.* at 845 (O'Connor, J., concurring in the judgment) ("We also concluded in *Agostini* . . . that the specific criteria used to determine whether government aid has an impermissible effect had changed.").

[3]This is consistent with the Court's initial articulation of the endorsement test, which asked whether the state action had the "purpose *or* effect of 'endorsing' religion," *Allegheny*, 492 U.S. at 592 (emphasis added), thus implicating the first two of *Lemon*'s three prongs.

under the endorsement test, and then separately and distinctly under *Lee*'s coercion test. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–12 (2000).[4]

2.

Often it is not entirely clear precisely what test the Court applies, or how the Court's approach should be characterized. This line of cases led Justice Scalia, joined by Justice Thomas, to opine in a case upholding the viewing of religious movies on school property outside of school hours:

> As to the Court's invocation of the *Lemon* test: Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence again, frightening the little children and school attorneys of Center Moriches Union Free School District. Its most recent burial, only last Term, was, to be sure, not fully six feet under: Our decision in [*Lee*] conspicuously avoided the supposed "test" but also declined the invitation to repudiate it. Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart . . . and a sixth has joined an opinion doing so.

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment) (collecting cases).

More recently, the Court has looked to history, as it did in *Marsh*. In 2005, a four-Justice plurality upheld a Ten Commandments display outside the Texas State Capitol by looking to the role of the Ten Commandments—and religion in general—throughout American history. *Van Orden*, 545 U.S. at 686–90 (opinion of Rehnquist, C.J.). The plurality concluded:

> Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation's history.

*Id.* at 686. Justice Breyer supplied the fifth vote to hold that *Lemon* (and thus the endorsement test) did not apply, but wrote separately to assert that instead of history, in such "borderline

---

[4]While three Justices once attempted to conjoin the endorsement and coercion tests, *see Lee*, 505 U.S. at 604 (Blackmun, J., concurring) (asserting that religious coercion "is an obvious indication that the government is endorsing . . . religion), the Court has instead always maintained them as strictly distinct tests. Indeed, for the reasons explained *infra*, these tests must always be separate because they are irreconcilable.

cases" courts can devise "no test-related substitute for the exercise of legal judgment." *Id.* at 700 (Breyer, J., concurring in the judgment). While subsequent to *Van Orden* this court still applied the endorsement test to a Ten Commandments display, *Mercer*, 432 F.3d at 636, it bears noting that the Supreme Court held in *Van Orden* that there is a new, undefined class of cases to which the *Lemon*/endorsement test does not apply.[5] This left Justice Thomas lamenting the fact that the Supreme Court's "jurisprudence provides no principled basis by which a lower court could discern whether *Lemon*/endorsement, or some other test, should apply in Establishment Clause cases." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 14 (2011) (Thomas, J., dissenting from the denial of certiorari). He encouraged the Court to grant certiorari in a case "which squarely implicates the viability and application of the *Lemon*/endorsement test." *Id.* at 22. This confusion was exacerbated in 2012, when the Supreme Court looked to history to conclude unanimously that the Establishment and Free Exercise Clauses of the First Amendment require a "ministerial exception" to employment laws for religious organizations and the ministers they employ. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 702–03, 705–08 (2012).[6] The Court decided that Establishment Clause case without any use of the *Lemon*/endorsement framework. Soon thereafter, Justice Alito agreed that "[t]his Court's Establishment Clause jurisprudence is undoubtedly in need of clarity." *Mt. Soledad Mem'l Ass'n v. Trunk*, 132 S. Ct. 2535, 2535 (2012) (concurring in the denial of certiorari).

B.

Notwithstanding these statements from individual Justices, and the fact that the Court has recently taken different approaches in other contexts, this is a school-funding case, and so this court is required to adhere to the *Lemon*/endorsement framework. Prior to *Allegheny*, the Supreme Court evaluated public funding cases under the first version of the *Lemon* test. *E.g.*, *Bowen*, 487 U.S. at 605–09. The Supreme Court has decided at least three Establishment Clause cases concerning school funding since the Court narrowly adopted the endorsement test a

---

[5]Some of our sister courts have consequently applied Justice Breyer's "legal judgment" test for certain types of Establishment Clause cases, indicating those courts have concluded the "legal judgment" standard has displaced the endorsement test in those contexts. *See, e.g.*, *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 777–78 (8th Cir. 2005) (en banc) (Ten Commandments); *Myers v. Loudon Cnty. Pub. Schs.*, 418 F.3d 395, 408 (4th Cir. 2005) (Pledge of Allegiance). Yet another circuit applied both tests. *See Trunk v. City of San Diego*, 629 F.3d 1099, 1109, 1117–18 (9th Cir. 2011) (federal war memorial with a Christian cross).

[6]We recently elaborated upon this ministerial exception, with an analysis that likewise focused on history. *See Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 832–37 (6th Cir. 2015).

quarter-century ago in *Allegheny*, and in each of those cases the Court applied some version of the *Lemon*/endorsement test. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652–55 (2002); *Mitchell*, 530 U.S. at 835–36 (plurality opinion); *Agostini*, 521 U.S. at 234–35. Moreover, two years before the Court revised *Lemon* with the endorsement test, the Court added in a footnote that courts should not consult history for Establishment Clause cases involving public schools. *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) ("Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.").[7] *Edwards*'s bar is accordingly an element of the *Lemon*/endorsement test when a case involves public schools.

It is true that *Town of Greece* does not *explicitly* declare either that *Allegheny* is overruled or that the Court has entirely jettisoned the endorsement test. But Justices Scalia and Thomas have done so. *See Elmbrook Sch. Dist. v. Doe*, 134 S. Ct. 2283, 2284 (2014) (Scalia, J., dissenting from the denial of certiorari) ("*Town of Greece* abandoned the antiquated 'endorsement test,' which formed the basis for the decision below."). In the short time since *Town of Greece* was decided, one of our sister circuits has—correctly, in my view—concluded that *Town of Greece* abrogated *Allegheny*. *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 238 (3d Cir. 2014).

But the full Supreme Court has not done so yet. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). The Court subsequently reaffirmed this rule in an Establishment Clause case, and indeed, specifically a school-funding case. *See Agostini*, 521 U.S. at 237 (quoting *Rodriguez de Quijas*, 490 U.S. at 484). Therefore notwithstanding *Town of Greece*'s broad language regarding the test that properly governs the Establishment Clause, discussed *infra*, unless and until the Supreme Court explicitly holds that it has abandoned the *Lemon*/endorsement test, the lower courts are bound to continue applying that test in contexts where the Court has previously employed it, including *Edwards* footnote 4's

---

[7]Several Justices on the Court, joined by various scholarly authorities, appear to reject the proposition found in this footnote in *Edwards*. *See infra* footnote 11 and accompanying text.

prohibition on examining history for public-school cases.  Solely for this reason, the endorsement test controls this case.

Application of that test here leads inexorably to the conclusion that the decision of the Jefferson County Board of School Commissioners is permissible under the Establishment Clause.  The facts are fully set forth in the lead opinion, and as that opinion explains, under the endorsement test we must view those facts from the perspective of a "reasonable observer," a hypothetical third party who is not an actual participant in the litigation.  This observer is a fictional person who is "more informed than the casual passerby," *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring in part and concurring in the judgment), one who is "deemed aware of the history and context of the community and forum in which the religious display appears," *id.* at 780.[8]  I agree with the lead opinion that no such reasonable observer would look at these facts and conclude the government was endorsing religion.  The extent of government involvement in the facts of this case goes no further than the involvement already validated by the Supreme Court in *Zelman*, *Mitchell*, and *Agostini*.  If the Court found no endorsement of religion there, then there is no warrant for us to find any endorsement here.

C.

But I cannot agree with the lead opinion's dismissing as irrelevant last year's Supreme Court opinion in *Town of Greece*.  There, in the context of a challenge to legislative prayer, the Supreme Court addressed the issue of what test governs an Establishment Clause challenge to government action.  *Town of Greece* is apparently a major doctrinal shift regarding the Establishment Clause, declaring a two-pronged test for Establishment Clause cases, a test based upon the historical approach the Court had followed in *Marsh*, *Van Orden*, and *Hosanna-Tabor*,

---

[8]Some of the sharpest criticisms of the endorsement test are directed against its "reasonable observer" or "objective observer," even by Justices who supported the Court's adoption of the test.  For example, Justice Stevens wrote:

> [The] reasonable observer is a legal fiction . . .  The ideal human Justice O'Connor describes knows and understands much more than meets the eye.  Her "reasonable person" comes off as a well-schooled jurist, a being finer than the tort-law model.  With respect, I think this enhanced tort-law standard is singularly out of place in the Establishment Clause context.

*Pinette*, 515 U.S. at 800 n.5 (Stevens, J., dissenting).  Leading scholars—including a former Tenth Circuit judge who does not support the endorsement test—concur.  *See, e.g.*, Michael W. McConnell, *Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115, 148–51 (1992); *cf. also* Laurence H. Tribe, *Constitutional Calculus: Equal Justice or Economic Efficiency?*, 98 Harv. L. Rev. 592, 611 (1985).

and adding the coercion principle it followed in *Lee* and *Santa Fe*.[9]  First, "[t]he Establishment Clause must be interpreted 'by reference to historical practices and understandings'. . . Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819 (quoting *Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in the judgment in part and dissenting in part)).  Second, "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Id.* at 1825 (plurality opinion) (quoting *Allegheny*, 492 U.S. at 659 (Kennedy, J.)).[10]  When the Supreme Court signals a sea change in constitutional law, I do not believe that we can lightly set it aside in a case implicating the same constitutional provision.  Therefore, while we must still apply the *Lemon*/endorsement test, *Town of Greece* should inform our analysis here.

1.

First, *Town of Greece*'s historical-inquiry test.  "'[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers.'" *Town of Greece*, 134 S. Ct. at 1819 (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 294 (1963) (Brennan, J., concurring)) (brackets in the original).  This test recognizes that our interpretation of the Establishment Clause must "comport[] with what history reveals was the contemporaneous understanding of its guarantees." *Lynch*, 465 U.S. at 673.  In this case, the question would be whether the Framers would regard the Kingswood contract as an establishment of religion.  Although footnote 4 of Justice Brennan's opinion for the Court in *Edwards* claims that a historical inquiry would not resolve this question, three dissenting Justices in *McCreary* apparently disagree, noting that the same First Congress that drafted the Establishment Clause in 1789 also reenacted as a federal statute a

---

[9]The first part of *Town of Greece*'s test—history—is the majority opinion of the Court.  The second part—coercion—is a three-Justice plurality, but is controlling on the lower courts, as it is narrower than the accompanying two-Justice concurring opinion. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation and editing marks omitted)).

[10]Two Justices in the majority, Justices Scalia and Thomas, did not join this part of Justice Kennedy's opinion, writing separately to agree that government may not coerce anyone to participate in religion, but that such unconstitutional coercion is "actual legal coercion" with "*force of law and threat of penalty*," which "was a hallmark of historical establishments of religion," and therefore was already barred by the historical-inquiry test adopted in the majority opinion. *Town of Greece*, 134 S. Ct. at 1837 (Thomas, J., concurring in part and concurring in the judgment).

measure of the Continental Congress that explicitly linked publicly supported schools with the teaching of both religion and morality. *See McCreary*, 545 U.S. at 887 (Scalia, J., dissenting) ("The [First] Congress also reenacted the Northwest Territory Ordinance of 1787, 1 Stat. 50, Article III of which provided: 'Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'").[11]  "[The Supreme] Court has often noted that actions taken by the First Congress are presumptively consistent with the Bill of Rights, and this principle has special force when it comes to the interpretation of the Establishment Clause." *Town of Greece*, 134 S. Ct. at 1834 (Alito, J., concurring) (citations omitted).  We would need to determine if the Framers would object to taxpayer money's paying for secular education in a building with no religious imagery, merely because the corporate entity that owns the building happens to have a religious mission, or because some *de minimis* religious symbol or sentence is found on the organization's non-classroom, non-instructional documents.

If the Board's contract would be historically acceptable to the Framers, we would then be required to also ask if it passes muster under the coercion prong of *Town of Greece*.  "The inquiry remains a fact-sensitive one that considers both the setting . . . and the audience . . . ." *Id.* at 1825 (plurality opinion).[12]  Here, the only activities required by the school contained not even a scintilla of religious content or imagery, and the only building where the students could observe any religious object—though again, while attending a purely optional lecture that would

---

[11]Many scholarly authorities likewise appear to sharply disagree with Justice Brennan's claim in that *Edwards* footnote that the rarity of public schools during the Founding era means that an examination of history does not illuminate whether, with the ubiquity of religious content in educational settings, the Framers would have concluded that governmental support would render such educational programs unconstitutional. *See, e.g.*, Corinna Barrett Lain, *God, Civic Virtue, and the American Way: Reconstructing* Engel, 67 Stan. L. Rev. 479, 486 nn. 30–31 (2015) (collecting scholarly treatises); *see also* Steven D. Smith, *Constitutional Divide: The Transformative Significance of the School Prayer Decisions*, 38 Pepp. L. Rev. 945, 967 & nn.140–41 (citing Noah Feldman, *Divided by God* (2005)); Joseph P. Viteritti, *Choosing Equality: Religious Freedom and Educational Opportunity Under Constitutional Federalism*, 15 Yale L. & Pol'y Rev. 113, 119–20 & n.22, 186 (1996) (citing Bernard Bailyn, *Education in the Forming of American Society* (1960)); Gerard V. Bradley, *Protecting Religious Liberty: Judicial and Legislative Responsibilities*, 42 DePaul L. Rev. 253 (1992).  Such a contention is especially problematic given that the only application of the Establishment Clause to the States is through the Fourteenth Amendment, *Everson*, 330 U.S. at 15, which was adopted in 1868 when public schools were common and religious instruction was pervasive in the typical curriculum, *see* Kyle Duncan, *Secularism's Laws: State Blaine Amendments and Religious Persecution*, 72 Fordham L. Rev. 493, 502–06 (2003).  However, since no inferior court can question the Supreme Court's pronouncement on the matter, only the Supreme Court can revisit the factual accuracy of footnote 4 in *Edwards*.

[12]The plurality's "fact-intensive" inquiry, *Town of Greece*, 134 S. Ct. at 1825, refers only to whether the plaintiff in a lawsuit faced the sort of coercion that the plurality said would transgress the constitutional line.  There is no fact-specific inquiry as to which test a court is to apply; the history-and-coercion test is set forth as a test that should govern all Establishment Clause claims.

be purely secular—could be visited only if the student chose to do so and the student's parents consented. The only other possible sources of coercion would be an innocuous biblical reference on a weekly feedback form or a Christian cross on an Easter letter. And we would evaluate it not from the vantage point of a parent or student, but instead of former employees who lost a paycheck, but never saw the offending stationery. Plaintiffs here were former employees, who never attended the chapel or received any letters as a consequence of the School Board's contract with Kingswood.

2.

The Court in *Town of Greece* gave several indications that it intends to displace the endorsement test, foremost of which was that Justice Kennedy's opinion for the Court went beyond *Marsh* to adopt his four-Justice dissent from *Allegheny*. When the Supreme Court adopted the endorsement test in *Allegheny* as the general rule for the Establishment Clause, the Court added in dictum that *Marsh* upheld legislative prayer because the sole prayer-giver, Reverend Robert Palmer, had removed all references to Jesus Christ, thus suggesting that sectarian prayers would violate the Establishment Clause. *See Allegheny*, 492 U.S. at 603. Because many prayers at Greece's town meetings contained explicitly Christian references, the Second Circuit held that *Allegheny* had modified *Marsh*, and invalidated the town's legislative-prayer practice as an endorsement of Christianity. *Galloway v. Town of Greece*, 681 F.3d 20, 27, 30–33 (2d Cir. 2012). In so doing, the Second Circuit agreed with the Fourth Circuit that, after *Allegheny*, the endorsement test was part of the rule governing legislative-prayer cases. *See Joyner v. Forsyth Cnty.*, 653 F.3d 341, 347 (4th Cir. 2011); *accord Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006), *vacated sub nom. on other grounds, Hinrichs v. Speaker of the House of Reps.*, 506 F.3d 584, 598–600 (7th Cir. 2007). Greece's petition for certiorari framed the issue before the Court as implicating the validity and reach of the endorsement test. *See* Petition for Writ of Certiorari at i, 9–13, 18–21, *Town of Greece*, 134 S. Ct. 1811 (No. 12-696). At the Supreme Court, the petitioner acknowledged that the Court could decide its case simply by reaffirming *Marsh*. Br. for Pet'r at 16–27, *Town of Greece*, 134 S. Ct. 1811 (No. 12-696). But the town went further, arguing at length that the Court should adopt a history-and-coercion approach and jettison the endorsement test. *See id.* at 27–50, 54–57. Various amicus briefs

argued almost exclusively that the Court should repudiate the endorsement test. *See, e.g.*, Br. of Indiana, Texas, and Twenty-One Additional States as Amici Curiae in Supp. of Pet'r at 3–36, *Town of Greece*, 134 S. Ct. 1811 (No. 12-696). The Solicitor General of the United States represented the Obama Administration in the case, and urged the Court to do the opposite, arguing that the Court should reverse the Second Circuit, but base its decision on *Marsh* alone. *See* Br. for the U.S. as Amicus Curiae at 9–30, *Town of Greece*, 134 S. Ct. 1811 (No. 12-696). The endorsement test was thus prominently at issue in *Town of Greece*.

The Court began its opinion by reversing the lower court based on *Marsh*, *Town of Greece*, 134 S. Ct. at 1815–19, and explicitly rejected *Allegheny*'s nonsectarian dictum, *id.* at 1821. But then the Court went further, explicitly holding that the Court did not "carv[e] out an exception," *id.* at 1818, to the Establishment Clause for legislative prayer due to some anomalous "historical foundation," *id.* at 1819. "*Any test* the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.* (emphasis added). The Court then took aim at the endorsement test. "Four dissenting Justices disputed that endorsement could be the proper test, as it likely would condemn a host of traditional practices that recognize the role religion plays in our society." *Id.* at 1821 (discussing *Allegheny*, 492 U.S. at 601 (majority opinion); *id.* at 670–71 (Kennedy, J.)). *Town of Greece* went beyond *Marsh* to hold that any Establishment Clause test must recognize historically accepted practices, *see id.* at 1819–24, and cited *Allegheny*'s dissent, specifically the part rejecting the newly minted endorsement test on the ground that many historically accepted actions (such as a crèche on public land) would not survive that test, *id.* at 1819 (citing *Allegheny*, 492 U.S. at 670 (Kennedy, J.)). This is followed by the plurality's adoption of the coercion test, *id.* at 1824–28 (plurality opinion of Kennedy, J.), where *Town of Greece* explicitly adopts the remainder of the *Allegheny* dissent, *see id.* at 1825 (quoting *Allegheny*, 492 U.S. at 659 (Kennedy, J.)); *id.* at 1827 (quoting *Allegheny*, 492 U.S. at 670 (Kennedy, J.)). The Court's reasoning in *Town of Greece* cannot be reconciled with the endorsement test. As already noted,

one of our sister courts has already held that the Supreme Court abrogated *Allegheny* in *Town of Greece*.  *See Tearpock-Martini*, 756 F.3d at 238.**13**

III.

In conclusion, although it appears the Supreme Court has rejected the endorsement test in favor of the historically grounded coercion test, lower courts are bound to follow Supreme Court cases invoking the endorsement test until the Justices explicitly overrule *Allegheny* and its progeny.  Therefore school-funding cases must be examined under the endorsement test.  Applying that test here, I agree that no reasonable observer would regard the School Board's action as an endorsement of religion.  Because there is no Establishment Clause violation, Plaintiffs are not entitled to damages or attorneys' fees.

I therefore concur in parts I–III and concur in the result.

---

**13**For the reasons the lead opinion explores, our case here is readily distinguishable from the Seventh Circuit's recent case of *Doe v. Elmbrook School District*, 687 F.3d 840 (7th Cir. 2012) (en banc), *cert. denied*, 134 S. Ct. 2283 (2014).  The facts arising from that public school's graduation ceremony are far removed from the facts of this case.  *See id.* at 845–47.  However, even if this case could not be distinguished from *Elmbrook*, Defendant here should still prevail because *Elmbrook* was wrongly decided.  For the reasons explained in the principal dissent for three judges, Supreme Court precedent did not require invalidation of Elmbrook School District's graduation program, and instead the en banc opinion was an unwarranted expansion of *Lee* and *Santa Fe*.  *See id.* at 861–69 (Ripple, J., joined by Easterbrook, C.J., and Posner, J., dissenting).  Moreover, *Elmbrook* was decided before *Town of Greece*.