DISSENT
GRIFFIN, Circuit Judge,
dissenting.
Since the founding of our Republic, Congress, state legislatures, and many municipal bodies have commenced each legislative session- with a prayer. Contrary to today’s decision, the Supreme Court has ruled twice that legislative prayer does not violate the Establishment Clause of the *292 United States Constitution.[1] Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). Moreover, today’s decision conflicts with the recent decision of the Court of Appeals for the Fourth Circuit upholding the constitutionality of legislator-led prayer. Lund v. Rowan Cty., 837 F.3d 407 (4th Cir. 2016). Because the majority’s opinion declaring Jackson County’s invocation practice unconstitutional contravenes the First Amendment and Supreme Court precedent, I respectfully dissent.
I.
Marsh v. Chambers was the first Supreme Court decision upholding legislative prayer against an Establishment Clause challenge. In Marsh, the plaintiffs claimed that the Nebraska Legislature’s practice of opening its sessions with a prayer by its chaplain violated the First Amendment. The salient facts of Nebraska’s practice included that the chaplain was only of one denomination (Presbyterian); the Legislature selected the chaplain for sixteen consecutive years; paid him with public funds; and the chaplain gave prayers “in the Ju-deo-Christian tradition.” 463 U.S. at 793, 103 S.Ct. 3330. The Supreme Court emphasized that these facts must be viewed against the historical background of legislative prayer, which dates back to our Republic’s founding: “The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.” Id. at 786, 103 S.Ct. 3330. The Continental Congress, for example, “adopted the traditional procedure of opening its session with a prayer offered by a paid chaplain.” Id. at 787, 103 S.Ct. 3330. Moreover, the First Congress “authorized the appointment of paid chaplains” for the chambers just three days before it approved the language of the First Amendment. Id. at 787-88, 103 S.Ct. 3330. Given this historical foundation, the Supreme Court rejected the claim that Nebraska’s invocation practice violated the Establishment Clause: “Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment,for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.” Id. at 788, 103 S.Ct. 3330. Based on this “unique,” “unambiguous and unbroken history ..., the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an ‘establishment’ of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.” Id. at 791, 792, 103 S.Ct. 3330.
That the Nebraska Legislature selected a chaplain of the same denomination for sixteen consecutive years was of no moment: “Absent proof that the chaplain’s reappointment stemmed from an impermissible motive,” one could not “perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church.” Id. at 793, 103 S.Ct. 3330. Nor was it material that public funds paid for the chaplain, given that the Continental Congress did the same. Id. at 794, 103 S.Ct. 3330. And finally, the Supreme Court cautioned against the judiciary “embark[ing] on a sensitive evaluation *293 or ... parsing] the content of a particular prayer.” Id. at 795, 103 S.Ct. 3330. That is, “[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330.
Marsh is widely viewed as “carving out an exception” to Establishment Clause jurisprudence “because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured th[e] inquiry.” Town of Greece, 134 S.Ct. at 1818 (citation omitted). This includes the generally applicable three-part Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), test for which Bormuth advocates. See, e.g., Am. Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd., 243 F.3d 289, 305-06 (6th Cir. 2001) (en banc) (“It is worth mentioning, perhaps, that even the author of the Lemon decision, the late Chief Justice Burger, did not see fit to apply the Lemon test when he wrote the Court’s opinion in [Marsh].”); accord Smith v. Jefferson Cty. Bd. of Sch. Commr’s, 788 F.3d 580, 589-90 (6th Cir. 2015).
Unfortunately, dicta in the Marsh opinion led to judicial confusion regarding its holding. This arose from a footnote in which the Court explained the “Judeo-Christian” nature of the prayers:
[Chaplain] Palmer characterizes his prayers as “nonsectarian,” “Judeo Christian,” and with “elements of the American civil religion.” Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.
463 U.S. at 793 n.14, 103 S.Ct. 3330.
In County of Allegheny v. A.C.L.U., 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a case involving a creche placed on the steps of a county courthouse, the Court drew a distinction between sectarian and nonsectarian references based upon this footnote. Id. at 603, 109 S.Ct. 3086. The nonsectarian reference in Marsh, as “recast[]” by County of Allegheny, Town of Greece, 134 S.Ct. at 1821, led some courts, including our own, to conclude that the constitutionality of legislative prayer turned upon content neutrality. See Stein v. Plainwell Cmty. Sch., 822 F.2d 1406, 1410 (6th Cir. 1987); see also Rubin v. City of Lancaster, 710 F.3d 1087, 1094 n.6 (9th Cir. 2013) (collecting cases). The Supreme Court corrected this error in Town of Greece v. Galloway.
II.
In Town of Greece, the town council invited local ministers to give invocations before each town board meeting. 134 S.Ct. at 1816. The town permitted any person of any faith to give the invocation, did not review the prayers in advance, and did not provide any guidance as to tone or content. Id. Although some had a “distinctly Christian idiom,” and for eight years only Christian ministers gave prayers, upon complaint of such pervasive themes, the town expressly invited persons of other faiths to deliver the prayer. Id. at 1816-17. Contending that the Establishment Clause mandated legislative prayers be “inclusive and ecumenical” to a “generic God,” some town residents sued. Id. at 1817.
In reversing the Second Circuit’s decision that Greece’s practice violated the Establishment Clause, the Supreme Court emphasized again the unique nature of legislative prayer: “legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful *294 society.” Id. at 1818. Purposeful prayers seeking to solemnly bind legislators are consistent with our tradition where the prayer givers “ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends.” Id. Most importantly, history teaches that these solemn prayers “strive for the idea that people of many faiths may be united in a community of tolerance and devotion.” Id. They are permissible because “[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.” Id. at 1823. This tradition extends not just to state and federal legislatures, but also to local legislative bodies. Id. at 1819.
Accordingly, the Supreme Court in Town of Greece addressed the issue of “whether the prayer practice in the town of Greece fit[] within the tradition long followed in Congress and the state legislatures,” and held that it did. Id. First, the Court rejected the notion that Marsh permits only generic prayers, abrogating County of Allegheny and overruling decisions to the contrary. Id. at 1820-24. That is, “Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content.” Id. at 1821. Marsh turned not on espousement of “generic theism,” but rather on the “history and tradition” showing prayer — even one that is explicitly Christian in tone — “in this limited context could coexist with the principles of disestablishment and religious freedom.” Id. at 1820 (citation and alteration omitted). Moreover, requiring nonsectarian prayers “would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town’s current practice of neither editing or approving prayers in advance nor criticizing their content after the fact.” Id. at 1822. Put differently, once the government has “invite[d] prayer into the public sphere,” it “must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.” Id. at 1822-23. Nonetheless, the Court acknowledged that there are limits:
If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.
[[Image here]]
Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not “exploited to proselytize or advance any one, or to disparage any other, faith or belief.”
Id. at 1823 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330).
The Supreme Court in Town of Greece had little trouble finding the invocation prayers were in keeping with our tradition. Id. at 1824. Though invoking. Jesus and other Christian references, the prayers involved “universal themes” like celebrating the changing of the seasons or calling for a “spirit of cooperation.” Id. To be sure, some prayers went astray of these themes, with one condemning “objectors [to the prayer practice] as a minority who are *295 ignorant of the history of our country” and another “lament[ing] that other towns did not have God-fearing leaders.” Id. (quotations omitted). But these remarks did not “despoil a practice that on the whole reflects and embraces our tradition.” Id. That is, “[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. Marsh ... requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer.” Id.
The Court also rejected the argument that the town violated the Establishment Clause by inviting predominantly Christian ministers to lead the prayer, noting that the town made reasonable efforts to identify all congregations within its borders and represented that it would welcome a prayer by anyone who wished to give one. Id. Moreover, the town’s composition of nearly all Christians did not “reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing.” Id.
Second, the Supreme Court in Town of Greece rejected the argument that the intimate nature of a town board meeting— where citizens attend meetings to “accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests”— coerces citizens to support a religion through legislative prayer. Id. at 1824-25.
Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, analyzed coercion broadly in the context of the “subtle coercive pressures” the audience might feel while listening to the prayer. He emphasized that “[t]he inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. at 1825 (Kennedy, J.). It must also be evaluated “against the backdrop of historical practice” and “presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews.” Id. It is the “lawmakers themselves,” not the public, who are the “principal audience for these invocations” as they “may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing.” Id. “For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right tó dissent by those who disagree.” Id. at 1826. And in concluding that “legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate,” Justice Kennedy emphasized that “[ajdults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions.” Id. at 1826-27.
In one paragraph, the three Justices discussed hypothetical facts that could change their analysis:
*296 The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Re-spondehts point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive.... Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support. Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined. In no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished. A practice that classified citizens based on their religious views would violate the Constitution, but that is not the case before this Court.
Id. at 1826. They also noted the audience had options to avoid the prayers altogether:
Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in Marsh, board members and constituents are “free to enter and leave with little comment and for any number of reasons.” Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who “presumably” are “not readily susceptible to religious indoctrination or peer pressure.”
Id. at 1827 (citations omitted).
Justices Thomas and Scalia did not join the coercion section of Justice Kennedy’s opinion (Part II-B), but expressly disagreed with it. In a separate opinion, Justice Thomas, joined by Justice Scalia, wrote that coercion is limited to “coercive state establishments” “by force of law or threat of penalty,” such as mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church. Id. at 1837 (Thomas, J., concurring in part and in the judgment). Most importantly, Justices Thomas and Scalia rejected Justice Kennedy’s broadening of coercion to also include social pressures:
At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modern notions that the Establishment Clause is violated whenever the “reasonable observer” feels “subtle pressure,” or perceives governmental “en-dors[ement].”
[[Image here]]
Thus, to the extent coercion is relevant to the Establishment Clause analysis, it *297 is actual legal coercion that counts — not the “subtle coercive pressures” allegedly felt by respondents in this case. The majority properly concludes that “[o]f-fense ... does not equate to coercion,” since “[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum.” I would simply add, in light of the foregoing history of the Establishment Clause, that “[p]eer pressure, unpleasant as it may be, is not coercion” either.
Id. at 1838 (alterations in original and internal citations omitted).
III.
In the present case, my colleagues refuse to follow Marsh and Town of Greece, concluding Jackson County’s prayer practice falls outside of the traditional understanding of legislative prayer. They do so by setting aside this historical-based analysis, and reviving Lemon’s endorsement test based upon three alleged distinctions: the identity of the prayer giver, the lack of non-Christian prayer givers, and the Commissioners’ purpose for giving the prayer. I respectfully disagree.
A.
The Supreme Court has recognized “[w]e are a religious people whose institutions presuppose a Supreme Being.” Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (emphasis added). All three of our branches of government have officially acknowledged religion’s role in American life. See Lynch v. Donnelly, 465 U.S. 668, 674-78, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (detailing the “official references to the valué and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders”).
Legislative prayer is part of this tradition: “The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.” Marsh, 463 U.S. at 786, 103 S.Ct. 3330. On this point, the Supreme Court has stated: “[T]he Framers considered legislative prayer a benign acknowledgment of religion’s role in society.” Town of Greece, 134 S.Ct. at 1819 (emphasis added). It “has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of ‘God save the United States and this honorable Court’ at the opening of [the Supreme Court’s (and Sixth Circuit’s)] sessions.” Id. at 1825 (Kennedy, J.). Thus, we must evaluate Jackson County’s prayer practice in light of our history, asking whether it “fits within the tradition followed in Congress and the state legislatures.” Id. at 1819. That tradition includes offering prayers, even those that reflect “beliefs specific to only some creeds,” that “seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws.” Id. at 1823.
Contrary to the majority’s approach, the Supreme Court has never taken a granular view of the practice, focusing not on who gives a prayer, but rather whether there is a general practice consistent with our historical traditions. Marsh, 463 U.S. at 792-95, 103 S.Ct. 3330; Town of Greece, 134 S.Ct. at 1819. Absent is any restriction as to who may give the prayer in order to be consistent with historical practice. Marsh, for example, reasoned that “[c]learly the men who wrote the First Amendment Religion Clause did not view *298 paid legislative chaplains and opening prayers as a violation of [the First] Amendment.” 463 U.S. at 788, 103 S.Ct. 3330. The Supreme Court’s reasoning omits the majority’s qualifier: “opening prayers by non-governmental officials.” Our history clearly indicates a role for legislators to give prayers before legislative bodies. See, e.g., S. Rep. No. 32-376, at 4 (1853) (“[The founders] did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators.”); American Archives, Documents of the American Revolutionary Period, 1774-76, v1:1112 (documenting legislator-led prayer in South Carolina’s legislature in 1775); see also Town of Greece, 134 S.Ct. at 1833 (Alito, J., concurring) (discussing proposal by Samuel Adams to have a delegate “open the session with a prayer,” but which was later opposed on sectarian grounds, not on the grounds that the prayer giver was a delegate).
Indeed, as reflected in the records in Marsh, and Town of Greece, this history of legislators leading prayers is uninterrupted. Take Marsh’s, conclusion that “the practice of opening sessions with prayer ... has been followed consistently in most of the states.” 463 U.S. at 789-90, 103 S.Ct. 3330. In drawing this conclusion, the Court relied on an amicus brief.by the National Conference of State Legislatures (“NCSL”), which surveyed the various practices across the state legislatures. Id. at n.11, 103 S.Ct. 3330. The NCSL expressly disclaimed the notion that chaplain-only prayers are the norm: “The opening legislative prayer may be given by various classes of individuals. They include chaplains, guest clergymen, legislators, and legislative staff members.... All bodies, including those with regular chaplains, honor requests from individual legislators either to give the opening prayer or to invite a constituent minister to conduct the prayer.” Brief of NCSL as Amicus Curiae, Marsh v. Chambers, 463 U.S. 783 (1983) (No. 82-83), 1982 WL 1034560, at *2, *3 (emphasis added).
The record in Town of Greece also emphasizes the long-standing practice of legislator-led prayer. Observe the prayer offered by one of Greece’s councilmen (and one that is quite similar to the prayers offered here):
Heifer: Please bow your heads and join me in prayer. Heavenly Father we thank you for this day. We thank you for the opportunity to now join together here to conduct the important public business that is before us. We -ask that you would guide the decision making and the discussions that take place this evening, and that you would bless each of the participants in the town board as well as all of those who are here in the audience and may be viewing on television. We pray this in your name, amen.
Joint Appendix at 66a-67a, Town of Greece v. Galloway, 134 S.Ct. 1811 (2014), 2013 WL 3935056. Other council members offered a silent prayer, directing the audience to “remain standing” and “bow heads” while reflecting upon the September 11, 2001, terrorist attacks and Greece residents who recently passed away. Id. at 26a-27a, 29a, 45a, 57a.
Here, Jackson County presented a 2002 NCSL study reinforcing its earlier conclusion that chaplains do not exclusively give opening prayers: “Forty-seven chambers allow people other than the designated legislative chaplain or a visiting chaplain to offer the opening prayer. Legislators, chamber clerks and secretaries, or other staff may be called upon to perform this opening ceremony.” (emphasis added). More specifically, legislators gave prayers in thirty-one states. The same study notes that only members are permitted to deliv *299 er prayers in Rhode Island. Closer to Jackson County, for example, the Michigan House of Representatives permits an invocation to “be delivered by the Member or a Member’s guest.” Mich. H.R.R. 16 (emphasis added). So too does Congress. See, e.g., 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (documenting invocation by Oklahoma Senator James Lankford); United States House of Representatives, Office of the Chaplain, Guest Chaplains, http:// chaplain.house.gov/ehaplaincy/guest_ chaplains.html (last visited Feb. 10, 2017) (listing guest chaplains “who have been recommended by the Members of Congress”).
Jackson County’s prayer practice is consistent with this tradition, and, therefore, the district court correctly ruled Bormuth had not established facts rendering the prayer practice outside the realm of Marsh and Town of Greece. One of the prayers Bormuth complains about is illustrative of typical prayers given by the Commissioners:
Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna give you all the thanks and all the praise for all that you do. Lord I wanna remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus’s náme. Amen.
As in Town of Greece, this and other prayers “do not fall outside the tradition [the Supreme Court] has recognized. A number of the prayers did invoke the name of Jesus, the Heavenly Father, or the Holy Spirit, but they also invoked universal themes,” 134 S.Ct. at 1824, such as asking for guidance to “make good decisions that will be best for generations to come,” and to express well-wishes to military and community members. There is no evidence that the prayers “denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion” or that there is a “pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose.” Id. at 1823, 1824.
There is a bit of irony in the majority opinion’s per se condemnation of legislator prayer. The purpose of legislative prayer is to “invite[] lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing.” Id. at 1823. As Justice Kennedy recognized, legislative prayer exists “largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers.” Id. at 1826 (Kennedy, J.). It “reflect[s] the values [public officials] hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.” Id. As one of Jackson County’s Commissioners stated, “Commissioners, as individuals, have a right to pray as we believe.”
Preventing Jackson County’s Commissioners from giving prayers of their own choosing detracts from their ability to take “a moment of prayer or quiet reflection [to] set[ ] the[ir] mind to a higher purpose and thereby ease[ ] the task of governing.” Id. Town of Greece tells us that “government must permit a prayer giver to address his or her own God or gods as conscience dictates,” and that it is- not the role of the judiciary to act “as [a] supervisor! ] and censorf ] of religious speech.” Id. *300 at 1822. That is exactly the role the majority assumes by finding an appreciable difference between legislator-led and legislator-authorized prayer.
B.
The majority opinion jettisons the historical overlay, and instead applies, in effect, the inapplicable Lemon test. It tells us, for example, that because the Commissioners give the prayers, “there is no distinction between the government and the prayer giver: they are one and the same.” Accordingly, Jackson County is “effectively endorsing a specific religion” because all of the commissioners were “Christian.” In doing so, it misconstrues the facts and Supreme Court precedent.
1.
Noticeably absent from the majority’s opinion is any acknowledgment that Jackson County’s invocation practice is facially neutral regarding religion. In Jackson County, on a rotating basis, each elected Commissioner, regardless of his or her religion (or lack thereof), is afforded an opportunity to open a session with a short invocation based on the dictates of his own conscience. Neither other Commissioners, nor the Commission as a whole, review or approve the content of the invocations.
The majority finds it significant that at the time of the sessions referenced in plaintiffs complaint, all the elected Jackson County Commissioners were “Christian.” While all the Commissioners presumably believed in Jesus Christ, the faiths of Christianity are diverse, not monolithic. The Reformation of the Sixteenth Century spawned an explosion of these diverse Christian faiths. Many of those practicing these new Christian faiths sought religious freedom in America and found refuge from the tyranny inflicted by sectarian governments. To guarantee religious liberty to all persons, including those practicing the emerging Christian religions, the drafters and ratifiers of the First Amendment of our Constitution provided:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.
U.S. Const. amend. I.
My colleagues do not know the religious faiths of the 2018-2014 Jackson County Commissioners. Nor does the majority know the religious faiths of the current Commissioners. In this regard, the religious allegiance of the members of the Commission is subject to change with each election cycle. A process, of course, that guarantees, “no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.” U.S. Const, art. VI, cl. 3. With each election, the people of Jackson County may elect a Commissioner who is Muslim, Buddhist, Hindu, Jewish, Mormon, Roman Catholic, Eastern Orthodox Christian, Baptist, Methodist, Presbyterian, Lutheran, Episcopalian, Congregationalist, Quaker, Amish, Mennonite, Pentecostal, “Animist,” Pagan, Atheist, Agnostic, and so on. The religious faiths of the periodically elected officials — including Jackson County’s Commissioners — are dynamic, not static. In fact, east of Jackson County is the City of Hamtramck, Michigan, which just elected a Muslim majority city council.[2] Were Mr. Bormuth elected to the Jackson County Board of Commissioners, under the religious-neutral Jackson County legislative prayer practice, he could *301 freely begin a legislative session with a prayer of his choosing — to “Mother Earth,” the sun, the moon (or otherwise).
2.
The conclusion in the majority opinion that Jackson County is “effectively endorsing a specific religion” is one borne out of Lemon, not Marsh or Town of Greece. Yes, the prayer giver and the government may be “one and the same,” but religious endorsement is a thread woven by the Lemon test. Smith, 788 F.3d at 587 (explaining that “the Sixth Circuit ‘has treated the endorsement test as a refinement or. clarification of the Lemon test’ ”) (citation omitted). If Lemon applied, whether the prayer givers and the government are “one and the same” (read, “excessive entanglement”) could go to endorsement of religion. But as the majority properly concludes in a later footnote, Lemon does not control this case.[3] Neither Marsh nor Town of Greece speak in Lemon’s, terms— i.e., balancing purposes and government entanglement — when examining the constitutionality of legislative prayer. In viewing Jackson County’s prayer practice through an endorsement rubric in lieu of through history and tradition, the majority effectively rewrites over thirty-plus years of Supreme Court jurisprudence — applying the Lemon rule instead of Marsh’s exception. See Town of Greece, 134 S.Ct. at 1818 (“Marsh is sometimes described as carving out an exception to the Court’s Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry.”) (internal quotation marks and citation omitted).[4]
For example, the majority opinion reasons Jackson County is “effectively endorsing a specific religion” because the Commissioners are all themselves of Christian faith. This does not comport with Marsh, where the Supreme Court sanctioned the practice of selecting the same Presbyterian clergyman for sixteen consecutive years. 463 U.S. at 793, 103 S.Ct. 3330. It also conflicts with Town of Greece, which held that “[p]rayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not ‘exploited to proselytize or advance any one, or to disparage any other, faith or belief.’” 134 S.Ct. at 1823 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330). Thus, the district court correctly concluded that the all-Christian makeup of the Commissioners is “immaterial”:
As elected officials, they were chosen as representatives whose interests were most closely aligned with the public’s, and their personal beliefs are therefore a reflection of the ‘community’s own overwhelmingly Christian demographic.... [T]he future may bring Commissioners of more diverse religious backgrounds who will deliver invocations in those traditions. To hold otherwise would contravene Marsh’s sanction of legislative prayer delivered for sixteen years by a single Presbyterian clergyman.
*302 (internal citations omitted). This reasoning also aptly applies Town of Greece’s express command that legislative bodies “must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.” Id. at 1822.
Jackson County is also not required to provide “opportunities for persons of other faiths” to offer invocations. Just like Greece, Jackson County maintains a facially-neutral prayer policy. Id. at 1824. The majority discards this similarity, telling us instead that the Supreme Court upheld the prayer practice in Town of Greece “in large part because it included prayers representing a variety of faiths.” In no part did Town of Greece depend upon religious heterogeneity. Its holding on this point is that “[s]o long as the town maintains a policy of nondiscrimination,” the Establishment Clause does not mandate a municipality of predominately one faith to “achieve religious balancing.” Id. Contrary to the majority’s assertion, Jackson County’s prayer policy permits prayers of any — or no — faith, and the County need not adopt a different policy as part of a “quest to promote a diversity of religious views.” Id. (internal quotation marks omitted). However, my colleagues “require the [County] to make ... judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each.” Id. (alterations and citation omitted). But as Town of Greece commands, such “judgments” are “wholly inappropriate.” Id. (citation omitted).
Nor does it matter that the Commissioners’ invocations “are literally ‘governmental speech.’ ” A public official need not be the one giving a prayer in order for the Establishment Clause to apply. Cf. Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 468, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (“A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message.”). An official chaplain (Marsh), invited members of the community (Town of Greece), and county commissioners (this case) are all government speakers when giving their respective prayers. Under the majority’s theory, prayers by agents (like in Marsh and Town of Greece) are somehow constitutionally different than prayers offered by principals. The Establishment Clause does not tolerate, much less require, such mechanical line drawing. Cf. Lynch, 465 U.S. at 678-79, 104 S.Ct. 1355 (“The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test.”); see also Simpson v. Chesterfield Cty. Bd. of Sup’rs, 404 F.3d 276, 289 (4th Cir. 2005) (Niemeyer, J., concurring) (stating in a pre-Town of Greece case that “when members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for the people, the religious liberties secured to the people by the First Amendment are not directly implicated, and the distinct, more tolerant analysis articulated in Marsh governs”).[5]
*303 Finally, the majority relies on statements by Commissioner Rice to conclude Jackson County desired to control prayer content. There are several problems with this conclusion. As set forth in much more detail in Part IV-B-1 of this opinion, the most important is that these statements fall within those prohibited from consideration by our appellate review principles. They are lifted from a November 12, 2013, meeting that Bormuth neither directed the district court to below, nor raised in his appellate brief to us. Bormuth has thus waived any argument as to these statements. Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2007); Overstreet v. Lexington-Fayette Urban Cty. Gov’t, 305 F.3d 566, 578 (6th Cir. 2002).
Even if we were to consider these statements, they do not support the majority’s reasoning. In Town of Greece, the Court rejected the notion that isolated objectionable prayers — those given by ministers who “disparaged those who did not accept the town’s prayer practice” — voided the entire practice. 134 S.Ct. at 1824. Plucking stray examples, concluded the Court, “do[es] not despoil a practice that on the whole reflects and embraces our tradition.” Id. Only upon presentment of “a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose” will “a challenge based solely on the content of a prayer” — here, the limiting of the prayer giver’s identity to elected officials who happen to all be one faith — likely succeed. Id.
Moreover, this use flies in the face of guidance eschewing examining the minds of individual legislators as it relates to legislative intent: “a judiciary must judge by results, not by the varied factors which may have determined legislators’ [actions]. We cannot undertake a search for motive in testing constitutionality.” Daniel v. Family Sec. Life Ins. Co., 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632 (1949); see also Tenney v. Brandhove, 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (“In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies.”) (footnote omitted). Rather, we must heed the Supreme Court’s admonition that “[ijnquiries into [legislative] motives or purposes are a hazardous matter.” United States v. O’Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). This is a concern,- I might add, that the Court has emphasized in Establishment Clause cases, which are to be reviewed objectively, “without any judicial psychoanalysis of a drafter’s heart of hearts.” McCreary Cty., 545 U.S. at 862, 125 S.Ct. 2722. Stated differently, “Establishment Clause analysis does not look to the veiled psyche of government officers.” Id. at 863, 125 S.Ct. 2722.[6]
*304 In sum, the record before us is one that fits neatly within the legislative invocation jurisprudence as set forth by the Supreme Court in Marsh and Town of Greece.
IV.
I also disagree with the majority’s second holding — that even if Jackson County’s prayer practice fits within the legislative prayer exception, it is unduly coercive.
A.
The majority opinion applies Part II-B of Justice Kennedy’s opinion as if it were the opinion of the Court. It is not.
On the issue of coercion, the Town of Greece decision produced a majority result, but not a majority rationale. Under these circumstances, Marks v. United States provides that “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.... ” 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citation omitted). “Taken literally, Marks instructs lower courts to choose the ‘narrowest’ concurring opinion and to ignore dissents.” United States v. Cundiff, 555 F.3d 200, 208 (6th Cir. 2009) (citation omitted). That is, we take the “one which relies on the ‘least’ doctrinally ‘far-reaching-common ground’ among the Justices in the majority.” Id. at 209 (citation omitted).
Justice Thomas’s concurring opinion (joined by Justice Scalia) is “a logical subset” of Justice Kennedy’s opinion, see, e.g., United States v. Kratt, 579 F.3d 558, 562 (6th Cir. 2009), and is the “narrowest” ground of the judgment. Therefore, Justice Thomas’s opinion is controlling under Marks. In his concurrence, Justice Thomas traced the historical roots of coercion to “coercive state establishments” — coercion only “by force of law and threat of penalty.” 134 S.Ct. at 1837 (Thomas, J., concurring in part and in the judgment). This would include, for example, mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church. Id.
In the instant case, the majority reasons to the contrary, claiming that Justice Kennedy’s coercion test applies because it “offers the least change to the law.” This is so, they argue, because Justice Kennedy cites concurring and plurality opinions while Justice Thomas relies upon dissents (and concurrences wherp there were controlling majority or plurality opinions). From this, my colleagues conclude that Justice Thomas’s concurrence “does not cite any controlling law to support” his theories and, therefore, is not the “opinion that offers the least change to the law.”
As the majority opinion admits, this premise is faulty: “the precise role of coercion in an Establishment Clause inquiry is unclear, especially within the context of legislative prayer. In that sense, both Justice Kennedy’s and Justice Thomas’s opinions involve at least some departure from the state of the law as it existed before Town of Greece.” (emphasis added). This puts it mildly. Marsh “carv[ed] out an exception” to the Supreme Court’s Establishment Clause jurisprudence. Id. at 1818 (citation omitted). This is “because it sustained legislative prayer without subjecting the practice to any of the formal tests *305 that have traditionally structured [the Establishment Clause] inquiry.” Id. (internal quotation marks and citation omitted). Marsh took no effort to evaluate legislative prayer through a coercive lens, and it did so over Justice Brennan’s dissenting opinion, which advocated for a coercion analysis. 463 U.S. at 798, 103 S.Ct. 3330 (Brennan, J., dissenting) (discussing “indirect coercive pressure upon religious minorities to conform” in the context of the Lemon test).
Town of Greece introduces coercion as an element to legislative prayer cases for the first time. There is no dispute that Chief Justice Roberts, Justice Kennedy, and Justice Alito agree that legal coercion constitutes coercion. On this, a majority of Justices agree. However, Justice Kennedy’s position offers more of a change in the law because his opinion would introduce a broader coercion analysis — as compared to Justice Thomas — where one never existed.
Fundamentally, Marks may not be used to create the fiction of Justices Thomas and Scalia joining the portion of Justice Kennedy’s opinion to which they expressly disagreed. The rationale of Marks that a Justice implicitly agrees with -a more narrow holding is inapposite to the positions of Justices Thomas and Scalia in Town of Greece who did not implicitly agree with Part II-B of Justice Kennedy’s opinion, but expressly disagreed with it in a separate, concurring opinion. For these reasons, the majority errs in applying Justice Kennedy’s test of coercion.
Under Justice Thomas’s opinion, Bor-muth’s challenge easily fails. (In fact, he makes no such argument to the contrary.) Bormuth only raises “subtle coercive pressures” which do not remotely approach rising to “actual legal coercion.” 134 S.Ct. at 1838 (Thomas, J., concurring in part and in the judgment). This resolves the issue in the County’s favor.
B.
Furthermore, even if Part II-B of Justice Kennedy’s opinion were precedent, it does not change the result in the present case. Under Justice Kennedy’s proposed rule, we presume that a “reasonable observer ... understands that ... [the] purpose[ of legislative prayer is] ... to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews.” Id. at 1825 (Kennedy, J.). That we permit legislative prayer “does not suggest that those who disagree” — like Bormuth — “are compelled to join the expression or approve its content” — as Bormuth admits he is not. Id.; see also id. at 1827 (“But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate.”). Whether a legislative prayer practice rises to the level of coercion “remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. at 1825; see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (“Whether a government activity violates the Establishment Clause is ‘in large part a legal question to be answered on the basis of judicial interpretation of social facts. Every government practice must be judged in its unique circumstances.’ ” (alteration and citation omitted)).
1.
I begin with what should always shape our cases: the record on appeal. The majority relies heavily on a video — a recording of a November 12, 2013, meeting of a subset of the Board — to draw its conclu *306 sions. To be sure, Jackson County records its Board of Commissioners’ meetings and makes these videos available online on its website.[7] However, the simple fact is that Bormuth did not present this video, or any other, to the district court. One need look no further than the opinions of the magistrate judge and district judge to confirm these newly found facts were not presented below. Like the parties’ briefing, those opinions touch only on the prayers’ content and make no such reference to the videos. Yet, at the suggestion not by Bormuth, but by Amicus on appeal, the majority has elected to expand the record. By relying upon these videos, the majority ignores a fundamental appellate principle: we cannot fault a district court for failing to address facts that were not before it.
“Our review of a district court’s summary-judgment ruling is confined to the record.” E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 765 (6th Cir. 2015) (en banc). Under Rule 56(c), the opposing party “has an affirmative duty to direct the court’s attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.” Chicago Title Ins., 487 F.3d at 995 (quoting In re Morris, 260 F.3d 654, 665 (6th Cir. 2001)). “This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden — for example, by remaining silent — its opportunity is waived and its case wagered.” Guarino v. Brookfield Twp. Trs., 980 F.2d 399, 405 (6th Cir. 1992). Simply stated, we “will not entertain on appeal factual recitations not presented to the district court when reviewing a district court’s decision.” Chicago Title Ins. Corp., 487 F.3d at 995 (internal citation omitted); cf. United States v. Crumpton, 824 F.3d 593, 614 n.6 (6th Cir. 2016) (Moore, J.) (declining to consider a video introduced at trial and played for the jury in part because “[t]he video was not made part of the district court’s record”). And this rule applies even if an appellant proffers evidence “that might ... show a genuine issue of material fact after the district court had granted the defendants’ motion for summary judgment.” Cacevic v. City of Hazel Park, 226 F.3d 483, 491 (6th Cir. 2000).
The majority opinion wholly ignores this well-established appellate principle, burying a footnote toward the end of its opinion stating that the videos were “part of the record before the district court.” Its only plausible support for this assertion is that Bormuth’s Amended Complaint averred that “[t]he County commissioners meetings are video recorded and posted on the Jackson County website: www.co.jackson. mi.us,” and that a transcription of the offered prayers attached to his motion for summary judgment also referenced the videos’ availability. In my view, the mere reference to the videos’ general availability falls well short of “direet[ing] the court’s attention to those specific portions of the record upon which [Bormuth sought] to rely to create a genuine issue of material fact.” Chicago Title Ins. Corp., 487 F.3d at 995. But in the majority’s view, such fleeting references somehow required the district court to spend countless hours litigating on Bormuth’s behalf in response to Jackson County’s motion for summary judgment by: (1) surfing the County’s website to find the archive of the meetings; (2) watching the several years’ worth of monthly meetings (and as but one example, the November 12, 2013, Personnel & Finance Committee meeting alone lasted over one hour); and (3) finding facts supporting Bormuth’s claim. We never require such advocacy by a district court, whether *307 it be for a pro se litigant like Mr. Bormuth, or otherwise. See, e.g., Guarino, 980 F.2d at 410 (a district court is not obligated to “comb the record from the partisan perspective of an advocate for the non-moving party”); cf. Pliler v. Ford, 542 U.S. 225, 281, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004) (“District judges have no obligation to act as counsel or paralegal to pro se litigants.”).[8]
There is yet another appellate procedure problem unresolved by the majority opinion. Outside of repeating the above statement from his Amended Complaint, Bor-muth’s appellate brief is, similarly silent with respect to the videos or their content. It is only in his reply on appeal — i.'e., after reviewing Amicus’s briefing raising these additional materials — that he first referenced the videos and made an argument regarding the new facts contained therein. “We have consistently held, however, that arguments made to us for the 'first time in a reply brief are waived.” Sanborn v. Parker, 629 F.3d 554, 579 (6th Cir. 2010). “[W]here the facts relied upon were presented neither to the district court nor to this Court until Plaintiff Appellant filed his reply, it would be improper for the Court to find that the district court erred in its failure to consider this newly-developed ... argument,” Overstreet, 305 F.3d at 578, especially, as it is here, “when the issue raised for the first time in reply is based largely on the facts and circumstances of the case.” Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir. 1986).
The problem becomes magnified when considering the majority’s irreconcilable decision to use these new facts, but yet rightfully rejects Amicus’s argument regarding prayer purpose (based upon yet another video) because Bormuth did not raise that argument below or in his appellate brief. There is no difference between this newly raised argument based on evidence not presented to the district court that the majority rejects, and the newly raised argument based on evidence not presented to the district court that the majority accepts. This dichotomy is unexplainable.
Based upon its expanded record, the majority concludes Jackson County’s prayer practice is coercive under Justice Kennedy’s test. I respectfully disagree.
2.
In this regard, I concur with District Judge Marianne O. Battani’s ruling that Jackson County’s invocation practice is not coercive:
The Court is not persuaded that the legislative prayer at issue here is unduly coercive based on the identity of the prayer-giver. As a practical matter, non-adherents had several options available to them: leave for the duration of the prayer; remain for the prayer without rising; or remain for the prayer while rising, in which case their acquiescence would not have been interpreted as agreement with the religious sentiments. It is not clear that the direction to “Please rise” carries more coercive weight when voiced by the Commissioners themselves than by a guest chaplain selected by the Board of Commissioners. Although nonadherents to Chris *308 tianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not. The language in Greece regarding requests to participate in prayer being made by legislators does not provide clear guidance on the outcome of this case — it is dicta contained in a plurality opinion and is therefore not binding. Additionally, the opinion states merely that “[t]he analysis would be different,” not that the outcome would be different had the instruction to rise been delivered by one of the legislators. Bormuth’s attestation that two Commissioners turned their backs to him during his presentations, while evidence of disrespect, does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer — rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments.
[[Image here]]
[I]f the Court determined that the constitutionality of a legislative prayer is predicated on the identity of the speaker, potentially absurd results would ensue. Under such a holding, an invocation delivered in one county by a guest minister would be upheld, while the identical invocation delivered in another county by one of the legislators would be struck down. In light of these considerations, the Court finds that the present legislative prayer practice is not coercive.
3.
My colleagues rule to the contrary, concluding that we must view coercion differently from prayers at legislative sessions because local government meetings are small, intimate, and often involve citizens “address[ing] issues immediately affecting lives.” To be sure, this difference was at the core of an opinion in Town of Greece: Justice Kagan’s dissent. 134 S.Ct. at 1851-52 (Kagan, J., dissenting) (“The majority thus gives short shrift to the gap — more like, the chasm — between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens.”). However, the five Justices in the Town of Greece majority did not adopt these distinctions. For this reason, my colleagues err in finding hypothetical coercion because “residents would not want to offend the local government officials they are petitioning.”
The majority opinion in the present case also makes much of the fact that Commissioners asked audience members to stand and assume a reverent position before giving the prayers. This point of distinction from Town of Greece leads my colleagues to rely upon this passage from Part II-B of Justice Kennedy’s opinion:
The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.... Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their *309 congregations in this way and might have done so thinking the action was inclusive, not coercive.
Id. at 1826 (Kennedy, J.). The analytical fallacy of focusing on this list of distinctions is that it ignores that “[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith”; and that a reasonable person understands that the purpose of legislative prayer is “to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews.” Id. at 1823, 1825. Bluntly, “[t]hat many appreciate these acknowledgments of the divine in our public institutions does not suggest that those who disagree are compelled to join the expression or approve its content.” Id. at 1825. As the district court stated, “[a]lthough nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not.” The majority’s application thus flips Justice Kennedy’s presumption against Jackson County, not in its favor.
And more importantly, just as in Town of Greece, “[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest.” Id. at 1827. (Commissioner Rice even suggested as much.) Bormuth admits that he refused to stand for the prayers and his “quiet acquiescence [should] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed.” Id. On this record, I refuse to equate these “commonplace” and “reflexive” requests as mandating prayer participation. Id. at 1832 (Alito, J., concurring) (noting, among other things, that the words “Let us pray” are “commonplace” and “reflexive”).
There is also nothing in the record indicating that the Commissioners treated Bormuth differently on account of his complaints regarding the prayer practice. That record is: two Commissioner’s comments regarding the draft prayer policy, and one turning his back on Bormuth when he criticized the sectarian prayer practice.[9] On the former, the statements discussing “attacks” on Jesus Christ and the Commissioners are in the context of an individual’s right to offer a prayer of his or her faith, without preclearance by “an administrator or judge”: “Bormuth is attacking us and, from my perspective, my Lord and savior Jesus Christ. Our civil liberties should not be taken away from us, as Commissioners”; “We Commissioners, as individuals, have a right to pray as we believe”; and “What about my rights?” See id. at 1823. And on the latter, I agree with the district court that however uncourteous, a Commissioner turning his back to Bormuth one time certainly does not constitute “strong criticism or disapproval.” Opprobrium, Black’s Law Dictionary (10th ed. 2014).
That leaves us with the majority opinion’s final conclusion: Jackson County allocated benefits and burdens due to Bor- *310 muth’s objection to its prayer practice by not appointing him to the . Solid Waste Planning Committee or the Board of Public Works. Taking the facts that were properly before the district court (including those proposed in Bormuth’s second motion to supplement),[10] I do not agree.
Beyond a template rejection letter, we know nothing about why Jackson County rejected Bormuth’s application to fill a vacancy on the Solid Waste Planning Committee. All we have are unverified assertions from his complaint. But in order to defeat Jackson County’s motion .for summary judgment, Bormuth was required to go “beyond the pleadings” and “do more than simply show that there is some metaphysical doubt as to material facts to survive summary judgment.” Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., 598 F.3d 257, 270 (6th Cir. 2010) (citation omitted).[11]
We know slightly more with respect to his application for an appointment to the Board of Public Works. Bormuth contends he was “the most qualified applicant,” yet the Commissioners appointed an individual who had run against one of the Commissioners. The Commissioners told Bormuth that they appointed the other person because he “was a former township supervisor who was involved with setting up a township recycling station and that his experience with recycling was the focus of his appointment.” Bormuth contends that he was more qualified than this person: “I was the primary person working for the closure of the JCRRF [Jackson County Resource Recovery Facility]”; “I have been one of the primary voices seeking to maximize recycling in Jackson County before the Solid Waste Planning Committee”; “I am the reason Jackson County now has a part time recycling coordinator to gather numbers on recycling volumes within the County”; and “I had been dia-loguing with Commissioner Duckham on ways to get glass used as a recycled material in our roads.” Bormuth was “incredulous” about the appointment of another individual and therefore drew the conclusion that “the Commissioners will not grant an appointment to anyone who does not believe in the evil scum jesús [sic] story.”
It is an evidentiary supposition to suggest, as the majority does, that, as a matter of law, “the County’s decision not to nominate [Bormuth] ... suggests that the Board of Commissioners was denying benefits to residents based on their beliefs.” Other than Bormuth’s attestation that he was “the most qualified applicant,” there is nothing in the record linking the refusal to appoint Bormuth to the Board of Public Works to his objection to the prayer policy. Bormuth even admits he was told that the candidate selected had prior governmental experience in setting up a recycling station. Without more facts about the selection process, this court should not, as a matter of law, draw the conclusion made by the majority.
*311 V.
I note my view as to the constitutionality of Jackson County’s invocation practice is consistent with the Fourth Circuit’s recent opinion in Lund v. Rowan County, 837 F.3d 407 (4th Cir. 2016).[12] Rowan County’s invocation practice is remarkably similar: the Rowan County Board opens its sessions with a commissioner-led invocation; the content of each invocation is at each commissioner’s' discretion, without pre-clearance by the board as a whole; the invocations have predominantly Christian tones; the commissioners typically say “let us pray” or “please pray with me” before giving the invocations; and members of the public who object to the practice can leave before, arrive after, or remain without participation. Id. at 411, 413.
In Lund v. Rowan County, the Court of Appeals for the Fourth Circuit held that this practice was consistent with the Supreme Court’s legislative prayer jurisprudence. First, it rejected the argument that the identity of the prayer giver is disposi-tive because “the Supreme Court attached no significance [in Marsh and Town of Greece] to the speakers’ identities in its analysis and simply confined its discussion-to the facts surrounding the prayer practices before it.” Id. at 418. Rather, and relying upon some of the same historical documents I reference, the Fourth Circuit concluded “the very ‘history and tradition’ anchoring the Supreme Court’s holding in Town of Greece underscores a long-standing practice not only of legislative prayer generally but of lawmaker-led prayer specifically.” [13] Id. And as the Fourth Circuit aptly points out, this historical practice makes sense in light of legislative prayer’s purpose — “If legislative prayer is intended to allow lawmakers to ‘show who and what they are’ in a public forum, then it stands to reason that they should be able to lead such prayers for the intended audience: themselves.” Id. at 420.
Second, the Fourth Circuit highlighted four “guideposts for analyzing whether a particular practice goes beyond constitutional bounds”: the selection of the content; the content; the selection of the prayer giver; and whether over time the practice conveys the view that the government advanced one religion over other creeds. Id. at 420-25. Each of these are just as applicable to Jackson County’s practice.
Selection of the content. Just like the majority here, the district court in Lund found commissioner-led prayers amounted to government supervision of prayer. Id. at 420. The Fourth Circuit disagreed, emphasizing that individual commissioners could “give[] their own prayer without oversight, input, or direction” from the board. Id. Put another way, “each commissioner is a free agent like the ministers in Town of Greece and the chaplain in Marsh who gave invocations of'their own choosing.” Id. at 421. Moreover, there was no evidence indicating the prayers given were “anything but a personal creation of each commissioner acting in accord with his or her own personal views.” Id. So too in Jackson County.
The content. As here, the content of the invocations given before Rowan County’s Board of Commissioners “largely encompassed universal themes, such as giving thanks and requesting divine guidance in deliberations.... There [wa]s no prayer in *312 the record asking those who may hear it to convert to the prayer-giver’s faith or belittling those who believe differently.” Id. at 422. The illustrative prayer given by the Fourth Circuit is universal, and neither proselytizes nor disparages:
Let us pray. Father we do thank you for the privilege of being here tonight. We thank you for the beautiful day you’ve given us, for health and strength, for all the things we take for granted. Lord, as we read the paper today, the economic times are not good, and many people are suffering and doing without. We pray for them; we pray that you would help us to help. We pray for the decisions that we will make tonight, that God, they will honor and glorify you. We pray that you would give us wisdom and understanding. We’ll thank you for it. In Jesus’ name. Amen.
Id. This prayer, as with the prayers about which Bormuth complains, “comes nowhere near the realm of prayer that is out of bounds under the standards announced in Town of Greece.” Id.
The selection of the prayer giver. As does the majority opinion for Jackson County, the district court in Lund faulted Rowan County for failing to promote religious diversity by only permitting commissioners to give invocations. Id. at 423. I agree with our sister circuit’s response to this point — “[Diversity among the beliefs represented in a legislature has never been the measure of legislative prayer.” Id. Rather, Town of Greece makes clear that legislative bodies need not “promote a diversity of religious views.” Id. (citing Town of Greece, 134 S.Ct. at 1824). Accordingly, “[ajbsent proof the Board restricted the prayer opportunity among the commissioners as part of an effort to promote only Christianity, we must view its decision to rely on lawmaker-led prayer as constitutionally insignificant.” Id. at 424. This is especially true given that — just like Jackson County’s practice — “[a] person of any creed can be elected to the Board and is entitled to speak without censorship.” Id.
Advancement of one religion over other creeds. The Fourth Circuit concluded that Rowan County’s prayer practice did not, over time, advance Christianity over other creeds. Id. at 424-25. The invocations offered before Rowan County were “largely generic petitions to bless the commissioners before turning to public business.... Had a chaplain offered prayers identical to those [in Lund], Town of Greece and Marsh would unquestionably apply to uphold the Board’s practice.” Id. at 425. “In other words, the degree of denominational preference projected onto the government with lawmaker-led prayer is not significantly different from selecting denominational clergy to do the same. Both prayers arise in the same context and serve the same purpose.” Id. The same is true in the present case.
Third, the Fourth Circuit found that Rowan County’s practice was not imper-missibly coercive. Preliminarily, it rejected the district court’s view that the Supreme Court’s prior coercion cases are applicable to legislative prayer cases, emphasizing the unique nature of this area of the law. Id. at 427 (“[Legislative prayer [is] a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines.”) (citation omitted). The Fourth Circuit did not address the Marks issue, however. Instead, it recognized “that the Board clearly did not engage in coercion under the view expressed by Justices Sca-lia and Thomas,” but nonetheless gave the plaintiffs the benefit of the doubt by also applying Justice Kennedy’s plurality opinion. Id.
Even under Justice Kennedy’s “more favorable” standard, the Court of Appeals for the Fourth Circuit held that the plain *313 tiffs failed to demonstrate coercion. Id. In large part, the Fourth Circuit emphasized the voluntariness of participating in the prayers, especially when evaluated in light of the fact that “[a]dults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views.” Id. (quoting Town of Greece, 134 S.Ct. at 1826 (Kennedy, J.)); see also id. at 428-29. Just like Bormuth, who admits he did not participate in Jackson County’s prayers, citizens attending Rowan County Board of Commissioner meetings “who found the prayer unwanted had several options available — they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating.” Id. at 428. And the same is true with why the Rowan County Commissioners’ requests to stand and pray before the giving of an invocation does not constitute coercion: viewing this “routine courtesy” through the lens of legislative prayer’s purpose “ ‘to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens,’ ... no reasonable person would interpret the commissioners’ commonplace invitations as government directives commanding participation in the prayer.” Id. at 429-30 (quoting Town of Greece, 134 S.Ct. at 1826 (Kennedy, J.)).[14]
Finally, whether the Lund majority’s opinion will stand as a matter of Fourth Circuit precedent will soon be decided. I take exception to my colleagues following Judge Wilkinson’s suggestion that public entities mandate non-denominational prayers and diverse prayer givers, or even offer a prophylactic “Message of Religious Welcome,” in order to cure any perceived Establishment Clause problems. See id. at 437-38 (Wilkinson, J., dissenting). This suggestion, as discussed, runs headlong into Marsh and Town of Greece — the constitutionality of legislative prayer does not turn on content neutrality, prayer-giver diversity, or advance trigger warnings, for one “may safely assume that mature adults, like [Bormuth himself admits], can follow such contextual cues without the risk of religious indoctrination.” Id. at 430.
VI.
For these reasons, I respectfully dissent. I would affirm the judgment of the district court.

. The Establishment Clause is applicable to the states by operation of the Due Process Clause of the Fourteenth Amendment. See, e.g., Everson v. Bd. of Ed. of Ewing Tp., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

. See Kris Maher, Muslim-Majority City Council Elected in Michigan, Wall St. J, Nov. 9, 2015, http://www.wsj.com/articles/muslim-majority-city-council-elected-in-michigan-1447111581.

. I also concur with the majority’s rulings that the Treaty of Tripoli does not govern this matter and that Bormuth does not have standing to assert his Pledge-of-Allegiance argument on behalf of other children.

. Query whether even the Lemon-test supports the majority's reasoning, for the Supreme Court has told us in that context that “prayers by legislators do not insistently call for religious action on the part of citizens.” McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 877 n.24, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

. Pre-Town of Greece case law from other circuits (some albeit abrogated because they relied on the notion that prayers must be ecumenical) supports the conclusion that the prayer giver's identity is not dispositive under the Marsh analysis. In a line of legislative prayer cases, the Fourth Circuit, for example, has characterized this position as "miss[ing] the forest for the trees.” Joyner v. Forsyth Cty., 653 F.3d 341, 350 (4th Cir. 2011) ("It [is] the governmental setting for the delivery of ... prayers that court[s] constitutional difficulty, not those who actually gave the invocation.”); see also Simpson, 404 F.3d at 286 ("The *303 Court, neither in Marsh nor in Allegheny, held that the identity of the prayer-giver, rather than the content of the prayer, was what would affiliate the government with any one specific faith or belief.”) (quotations and alterations omitted). And retired Justice O'Con-nor, sitting by designation, authored an opinion holding that prayers only given by city council members were permissible. See Turner v. City Council of City of Fredericksburg, 534 F.3d 352, 355-56 (4th Cir. 2008). Other circuits are in accord. See Pelphrey v. Cobb Cty., 547 F.3d 1263, 1281 (11th Cir. 2008) (listing “the identity of the speaker” as one of many factors to consider); Snyder v. Murray City Corp., 159 F.3d 1227, 1233 (9th Cir. 1998) (en banc) ("[T]here can be no Establishment Clause violation merely in the fact that a legislative body chooses not to appoint a certain person to give its prayers.”) (emphasis added).

. The majority also takes these statements out of context. During that meeting, Jackson County's administrator proposed a policy (in response to this litigation) that allowed clergy *304 to present opening prayers. Rice's statements are made within the context of who is defined as one who can present the prayer after being advised by the administrator that the policy seeks to codify a nondiscriminatory selection of clergy: i.e., the Board cannot “give direction” as to what kind of prayer can be offered and that "[t]hey can say whatever they want to say.” http://tinyurl.coin/2013novl2 (29:30, 32:00).

. https://www.co.jackson.mi.us/1673/Board-of-Commissioners.

. The majority also relies upon Bormuth’s response to Jackson County’s motion for summary judgment, but that response makes no reference to the videos or their express content. Noticeably absent are the statements referenced by the majority regarding controlling prayer content, the content of other meetings, and calling Bormuth a "nitwit.” Finally, the majority incorrectly states Jackson County admitted at oral argument that the videos were part of the "official record” before the district court. Rather, counsel stated the videos were part of the County’s official public records.

. Citing comments from the November 12, 2013, Personnel & Finance Committee meeting, the majority concludes Jackson County singled Bormuth out for opprobrium. These comments were, of course, not presented to the district court and were not raised by Bor-muth in his appellate brief and, therefore, are not properly before us.

. Given this, I disagree with the majority opinion’s conclusion that the district court abused its discretion by denying Bormuth’s second motion to supplement.

. Citing Bormuth’s initial disclosures, the majority invents the argument that Bormuth sought to depose the Commissioners for more information about Bormuth’s efforts to close ithe Jackson County Resource Facility. The record shows, however, that in response to the County's motion to quash these depositions, he made no such argument and instead focused solely on Jackson County’s prayer practice and the individual Commissioners' intent in giving prayers. As set forth in the text, individual Commissioners' intent is not pertinent to our inquiry. For these reasons, the majority wrongly concludes the district court erred in quashing Bormuth’s deposition notices for the Commissioners.

. I recognize the Fourth Circuit is reconsidering Lund en banc, but still find its reasoning to be persuasive.

. On this point, even the dissenting judge in Lund agreed. 837 F.3d at 432-33 (Wilkinson, J., dissenting) ("As the majority ... rightly remind[s], there exists a robust tradition of prayers delivered by legislators.”).

. Moreover, the Fourth Circuit rejected the plaintiffs' claim that they were singled out for opprobrium based upon several statements by commissioners that "were critical of those in the religious minority”: "[s]uch isolated incidents do not come close to showing ... 'a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose.'" Id. at 430 (quoting Town of Greece, 134 S.Ct. at 1824). These statements — "I am sick and tired of being told by the minority what's best for the majority. My friends, we’ve come a long way — the wrong way. We call evil good and good evil,” for example — are akin to those the majority relies upon in the present case. Id.